[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 07-13810

_____

D. C. Docket No. 06-01151-CV-ODE-1

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
October 8, 2008
THOMAS K. KAHN
CLERK

JOHN MIZZARO, on behalf of himself and all others
similarly situated,
BUCKS COUNTY RETIREMENT BOARD, Lead Plaintiff,

Plaintiffs-Appellants,

versus

HOME DEPOT, INC.,
ROBERT L. NARDELLI, et. al.,

Defendants-Appellees.

_____

No. 07-13811

_____

D. C. Docket No. 06-01197-CV-ODE-1

M. BRAD BICKERSTAFF, Individually and on behalf of all others
similarly situated,
BUCKS COUNTY RETIREMENT BOARD, Lead Plaintiff,

Plaintiffs-Appellants,

versus

HOME DEPOT, INC.,
ROBERT L. NARDELLI, et. al.,

Defendants-Appellees.

_____

No. 07-13812

_____

D. C. Docket No. 06-01349-CV-ODE-1

BRUCE B. BELODOFF, Individually and on behalf of all others
similarly situated,
BUCKS COUNTY RETIREMENT BOARD, Lead Plaintiff,

Plaintiffs-Appellants,

versus

HOME DEPOT, INC.,
ROBERT L. NARDELLI, et. al.,

Defendants-Appellees.

_____

No. 07-13813

_____

D. C. Docket No. 06-01617-CV-ODE-1

2

ROBERT D. JAFFEE, As trustee of the Robert D. Jaffee Revocable Trust,
on behalf of plaintiff and all others similarly situated,
BUCKS COUNTY RETIREMENT BOARD, Lead Plaintiff,

Plaintiffs-Appellants,

versus

HOME DEPOT, INC.,
ROBERT L. NARDELLI, et. al.,

Defendants-Appellees.

_____

No. 07-13859
_____

D. C. Docket No. 06-01616-CV-ODE-1

PAUL COBLE, On behalf of plaintiff and all others similarly situated,
BUCKS COUNTY RETIREMENT BOARD, Lead Plaintiff,

Plaintiffs-Appellants,

versus

HOME DEPOT, INC.,
ROBERT L. NARDELLI, et. al.,

Defendants-Appellees.

3

_____

Appeals from the United States District Court
for the Northern District of Georgia
_____
**(October 8, 2008)**

Before CARNES and MARCUS, Circuit Judges, and BUCKLEW,[*] District Judge.

MARCUS, Circuit Judge:

To survive a motion to dismiss under the Private Securities Litigation Reform Act of 1995, the factual allegations contained in a private securities fraud class action complaint must raise a "strong inference," one that is "cogent and compelling," that the named defendants acted with the requisite scienter. The question presented in this appeal is whether lead plaintiff Bucks County Retirement Board's ("Bucks County's") Amended Class Action Complaint ("ACAC" or "amended complaint") against Home Depot, Inc. and six of its officers and directors has met this demanding standard. The district court said "no," dismissed the complaint for failure to state a claim, and denied as futile a motion for leave to amend. After thorough review, we affirm.

I.

---

[*] Honorable Susan C. Bucklew, United States District Judge for the Middle District of Florida, sitting by designation.

This case began on May 12, 2006, when John Mizzaro, an individual investor in Home Depot stock, filed a securities fraud class action complaint against Home Depot, Inc. and several of its officers and directors in the United States District Court for the Northern District of Georgia. In short order, four more individual investors filed essentially identical complaints. The district court consolidated the cases "for the purposes of discovery and case management only," Doc. 30 at 2, and appointed Bucks County, a major investor in Home Depot stock, as the sole lead plaintiff, see 15 U.S.C. § 78u-4(a)(3)(B)(i) (requiring the district court to appoint as lead plaintiff "the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members"). The defendants then moved to dismiss each of the five pending cases. Rather than defend the existing complaints (which it presumably had no part in drafting), Bucks County filed a 150-page Amended Class Action Complaint, which became the operative pleading in all five cases.

The amended complaint is a putative class action on behalf of every shareholder who purchased Home Depot stock between May 29, 2001 and February 22, 2005 (the "class period"). In a nutshell, the amended complaint alleges that (1) Home Depot obtained excessive rebates from its vendors, and (2)

5

violated the securities laws by not informing investors that the financial results it reported for fiscal years 2001-2004 were inflated by these excessive rebates. In addition to Home Depot, Inc., the amended complaint names six high-ranking Home Depot officials as defendants -- senior executives Robert Nardelli, the President, Chief Executive Officer, and Chairman of the Board; Carol Tomé, an Executive Vice President and the Chief Financial Officer; and Larry Mercer, the Executive Vice President of Store Operations; and board members Kenneth Langone, Berry Cox, and John Clendenin -- and claims that their failure to disclose the alleged earnings inflation violated § 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. The amended complaint also asserts that the individual defendants are liable for the § 10(b) and Rule 10b-5 violations by Home Depot, Inc., because they qualify as "control persons" under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

Rather than answer Bucks County's lengthy pleading, all of the defendants moved to dismiss the amended complaint, arguing, among other things, that it failed to create a "strong inference" that they acted with the requisite scienter. 15 U.S.C. § 78u-4(b)(2). While the motion to dismiss was pending, Bucks County moved for leave to amend if the district court concluded that the amended

complaint failed to state a claim. The district court granted the defendants' motion to dismiss in a lengthy order and denied leave to amend, concluding that, under controlling law, the amended complaint had failed to adequately plead scienter, and that granting leave would be futile because the additional facts presented in the motion for leave would not change that result.

## II.

We review <u>de</u> <u>novo</u> an order granting a motion to dismiss for failure to meet the heightened pleading standards embodied in the PSLRA. <u>Garfield v. NDC Health Corp.</u>, 466 F.3d 1255, 1261 (11th Cir. 2006). Moreover, because denial of leave to amend based on futility is a legal conclusion, we review the denial <u>de novo</u> as well. <u>St. Charles Foods, Inc. v. America's Favorite Chicken Co.</u>, 198 F.3d 815, 822 (11th Cir. 1999).

An understanding of the nature of the legal claims asserted by Bucks County and the special pleading rules that apply to them is essential to deciding this case. Bucks County's primary claim is that Home Depot and the six individual defendants violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making material misrepresentations or omissions in press releases and in the company's financial statements. Section 10(b) makes it unlawful to

7

use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b-5, in turn, forbids

any person, directly or indirectly, . . .

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

Under these provisions, a securities fraud claim based on failure to reveal information to investors, as Bucks County has alleged here, has six elements: (1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the missstatement or omission; (5) economic loss; and (6) a causal connection between the material misrepresentation or omission and the loss, commonly called "loss causation." Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005).

8

Bucks County also claims that the six individual defendants are liable as "control persons" under § 20(a) of the Exchange Act. Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). This statute "imposes derivative liability on persons that control primary violators of the Act." Laperriere v. Vesta Ins. Group, Inc., 526 F.3d 715, 721 (11th Cir. 2008) (per curiam). To state a claim under § 20(a), Bucks County must allege three elements: (1) that Home Depot, Inc. committed a primary violation of the securities laws; (2) that the individual defendants had the power to control the general business affairs of Home Depot; and (3) that the individual defendants "had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in primary liability." Theoharous v. Fong, 256 F.3d 1219, 1227 (11th Cir. 2001) (quotation marks omitted); accord Brown v. Enstar Group, Inc., 84 F.3d 393, 396-97 (11th Cir. 1996). Because a primary violation of the securities laws is an essential element of a § 20(a) derivative claim, we have held that a plaintiff adequately pleads a § 20(a) claim only if the primary violation is adequately pleaded. See, e.g., Garfield, 466 F.3d at

9

1261; Theoharous, 256 F.3d at 1227. Therefore, the pivotal issue in this case remains whether Bucks County adequately pleaded a violation of § 10(b) and Rule 10b-5.

Ordinarily, a complaint is adequate if it meets Fed. R. Civ. P. 8(a)(2)'s requirement of "a short and plain statement of the claim showing that the pleader is entitled to relief." But securities fraud claims, like other types of fraud claims, have always been subject to Fed. R. Civ. P. 9(b)'s heightened pleading requirements, which require a complaint "to state with particularity the circumstances constituting fraud." As we have previously observed,

> Rule 9(b) is satisfied if the complaint sets forth "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud."

Tello v. Dean Witter Reynolds, Inc., 494 F.3d 956, 972 (11th Cir. 2007) (quoting Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1202 (11th Cir. 2001)). Notably, Rule 9(b) does not require a plaintiff to allege specific facts related to the defendant's state of mind when the allegedly fraudulent statements were made. Instead, as Rule 9(b) itself states, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Thus, under Rule 9(b), it

10

is sufficient to plead the who, what, when, where, and how of the allegedly false statements and then allege generally that those statements were made with the requisite intent.

But in 1995, "[a]s a check against abusive litigation by private parties," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2504 (2007), Congress passed the Private Securities Litigation Reform Act ("PSLRA"), Pub. L. No. 104-67, 109 Stat. 737 (1995), which made two notable changes to the pleading requirements for securities fraud class actions. First, the PSLRA slightly altered Rule 9(b)'s particularity requirement by mandating that a securities fraud class action complaint

> specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1)(B).

Second, and more importantly, the PSLRA raised the standard for pleading scienter. Specifically, in any securities fraud class action

> in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

11

15 U.S.C. § 78u-4(b)(2) (emphasis added).  Thus, in a securities fraud class action, a plaintiff can no longer plead the requisite scienter element generally, as he previously could under Rule 9(b).  Moreover, the complaint must allege facts supporting a strong inference of scienter "for each defendant with respect to each violation."  Phillips v. Scientific-Atlanta, Inc., 374 F.3d 1015, 1016 (11th Cir. 2004).

Although the PSLRA substantially raised the pleading standard for scienter, it did not change any substantive intent requirements.  Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1284 (11th Cir. 1999).  In this Circuit it is by now well-established that § 10(b) and Rule 10b-5 require a showing of either an "intent to deceive, manipulate, or defraud," or "severe recklessness."  Id. at 1282 (quotation marks omitted).  We have described "severe recklessness" this way:

> Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

Id. at 1282 n.18 (quotation marks omitted).  Putting the PSLRA and our substantive scienter case law together yields the following stringent standard:  to survive a motion to dismiss in this case, Bucks County must (in addition to

12

pleading all of the other elements of a § 10(b) claim) plead "with particularity facts giving rise to a strong inference" that the defendants either intended to defraud investors or were severely reckless when they made the allegedly materially false or incomplete statements.

Any discussion of what constitutes a "strong inference" of scienter must begin with the Supreme Court's recent decision in Tellabs. In that case, the Court held that a "strong inference" of scienter means an inference that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 127 S. Ct. at 2510. Because the strong-inference inquiry asks "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard," "courts must consider the complaint in its entirety," and "omissions and ambiguities count against inferring scienter." Id. at 2509, 2511. Moreover, the inquiry is "inherently comparative" because courts "must take into account plausible opposing inferences." Id. at 2510, 2509. Tellabs explained how to balance opposing inferences this way:

> To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, i.e., of the

13

"smoking-gun" genre, or even the "most plausible of competing inferences." . . . Yet the inference of scienter must be more than merely "reasonable" or "permissible" -- it must be cogent and compelling, thus strong in light of other explanations.

Id. at 2510. "In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" Id. at 2511.

Notably, this test is not the same as the standard we employ for summary judgment under Fed. R. Civ. P. 56, because it asks what a reasonable person would think, not what a reasonable person could think. Compare Tellabs, 127 S. Ct. at 2510 ("A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.") (emphasis added) with Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986) ("The judge's inquiry [at the summary judgment stage] . . . asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict[.]") (emphasis added).

One topic Tellabs did not address is how courts should go about evaluating allegations based on statements made by unidentified, confidential witnesses. The issue is important here because statements by confidential witnesses form one of

14

the main building blocks of the amended complaint. The defendants argue that allegations based on statements by confidential witnesses should be "heavily discounted" in all cases. Not surprisingly, Bucks County says the amended complaint's confidential-witness allegations are entitled to great weight and should not be discounted simply because the names of the witnesses have been withheld. Although a whistleblower who demands confidentiality may be less credible than one who is willing to put his name behind his accusations, we do not put as much weight on that inference as the defendants suggest.

Courts are often called upon to evaluate confidential sources to determine whether an affidavit establishes probable cause to issue a search warrant. In that area of the law, it is well-settled that a confidential, indeed even an anonymous source may support a finding of probable cause where the tipster provides the specific basis for his knowledge. See Illinois v. Gates, 462 U.S. 213, 230 (1983) (describing an anonymous informant's "basis of knowledge" as "highly relevant in determining the value of his report"); United States v. Brundidge, 170 F.3d 1350, 1353 (11th Cir. 1999) (per curiam) (refusing to suppress evidence seized pursuant to a search warrant because of, among other things, the "good" "basis of knowledge" of the informant relied on by the warrant-application affiant). Applying the same logic here, we see no reason to adopt a per se rule that always

15

requires a securities-fraud complaint to name the confidential source, so long as the complaint unambiguously provides in a cognizable and detailed way the basis of the whistleblower's knowledge. Accord In re Cabletron Sys., Inc., 311 F.3d 11, 21 (1st Cir. 2002); Novak v. Kasaks, 216 F.3d 300, 313-14 (2d Cir. 2000); CALPERS v. Chubb Corp., 394 F.3d 126, 147 (3d Cir. 2004); Teacher's Ret. Sys. v. Hunter, 477 F.3d 162, 174 (4th Cir. 2007); ABC Arbitrage Plaintiffs Group v. Tchuruk, 291 F.3d 336, 353-54 (5th Cir. 2002); Makor Issues & Rights, Ltd. v. Tellabs, Inc., 513 F.3d 702, 712 (7th Cir. 2008); In re Daou Sys., Inc., 411 F.3d 1006, 1015-16 (9th Cir. 2005); Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1101-02 (10th Cir. 2003).

We are, however, careful not to carry the search-warrant analogy too far. For one thing, the probable-cause standard for issuing search warrants is less stringent than the "cogent and compelling" standard imposed on plaintiffs under the PSLRA. For another, lying to the police or to law enforcement in general will likely lead to much harsher consequences than lying to a plaintiff's attorney, so statements by confidential police informants may be more reliable than conversations between plaintiffs' attorneys and whistleblowers. These are just two reasons why courts may be skeptical of confidential sources cited in securities fraud complaints; there are likely others. We conclude that the weight to be

16

afforded to allegations based on statements proffered by a confidential source depends on the particularity of the allegations made in each case, and confidentiality is one factor that courts may consider. Confidentiality, however, should not eviscerate the weight given if the complaint otherwise fully describes the foundation or basis of the confidential witness's knowledge, including the position(s) held, the proximity to the offending conduct, and the relevant time frame.

## III.

We turn to the factual allegations in the amended complaint, which we accept as true for the purposes of this appeal. Tellabs, 127 S. Ct. at 2509. As our discussion of the applicable law makes clear, a court examining a motion to dismiss under the PSLRA must carefully examine the complaint to determine whether the allegations, taken as a whole, create a cogent and compelling inference that the named defendants acted with the requisite scienter. Accordingly, we begin our review with the amended complaint's description of the fraud.

## A.

As any would-be home improver knows, Home Depot sells "a wide assortment of building materials, home improvement and lawn and garden

17

products, and offer[s] a variety of installation services," through over 2000 stores nationwide. ACAC ¶ 14. Home Depot obtains its merchandise from third-party vendors. By contract, these vendors grant Home Depot a credit, commonly known as a "return-to-vender" or "RTV" chargeback for defective merchandise. Id. ¶ 45. Some of Home Depot's vendor contracts allow the company to "process an RTV chargeback for defective merchandise and then dispose of the merchandise (rather than return it to the vendor)[.]" Id. ¶ 46. (Colloquially, this practice is called "destroy-in-field." Id.) In general, vendor contracts with such provisions contain "an 'allowance' or 'ceiling' under which Home Depot could process the RTV and dispose of predetermined amounts of the supposedly defective merchandise without the vendor's inspection of the goods." Id. According to the amended complaint, "[t]he accounting treatment for a legitmate RTV is straightforward": "When an RTV chargeback is processed, the Company makes an adjustment to 'cost of goods sold' in an amount that offsets or negates the original cost." Id. ¶ 48. Thus, "[l]egitimate RTV chargebacks have no impact on a company's financial results." Id.

"[I]llegitimate RTV chargeback[s]," on the other hand, may "artificially inflate[] a company's earnings and profit margins." Id. Earnings inflation can occur in two ways. First, illegitimate RTVs can be used to reduce "shrink," which

is retail-industry lingo for inventory that is lost or damaged due to shoplifting, employee theft, store use, or damage by store employees. The amended complaint says that "[t]he proper accounting treatment for shrink is to write-down the missing product to zero, which cuts directly into a company's earnings and operating margin[.]" Id. ¶ 52. A company may fraudulently reduce shrink by classifying missing inventory as defective and receiving an RTV chargeback for that amount under a destroy-in-field provision. Second, a company can fraudulently claim an item is defective and receive an RTV chargeback under a destroy-in-field provision, and then sell the product to a customer. According to the amended complaint, this specie of fraud produces "100% pure profit (because the fraudulent RTV offset[s] the cost of the merchandise)[.]" Id. ¶ 53.

The amended complaint alleges that Home Depot stores routinely processed fraudulent RTV chargebacks as part of a "companywide scheme" to boost profits. Id. The amended complaint relies on five kinds of evidence to demonstrate the scope and duration of the scheme: (1) confidential employee witnesses; (2) newspaper articles; (3) internal Home Depot documents; (4) one whistleblower complaint; and (5) commentary on the SEC's inquiry into Home Depot's practices.

### 1. Confidential Witnesses

Six confidential witnesses are cited in the amended complaint. The most important is "CW1," who was the Director of Home Depot's Northwest Division from 1997 through 2003. His "job responsibilities included oversight of 300 stores in 12 states and supervision of at least 26 district managers." Id. ¶ 54. CW1 stated that "fraudulent misconduct" -- meaning both methods described above for using fraudulent RTV chargebacks to inflate revenue and profits -- was "'common place' at Home Depot throughout the course of his/her employment." Id.

CW1 also said that in 2001 Home Depot published a Strategic Operating Plan that forecast a reduction in the Northwest Division's shrink from 2.04% in 2001 to 1.29% in 2004. Id. ¶ 84. According to CW1, the Plan set forth a "Shrink Benefit Summary" that included numerous initiatives to reduce shrink, such as increased physical security. Among the initiatives was a "Refunds/Returns/RTVs line item" that forecast benefits increasing from $4.32 million in 2002 to $15.3 million in 2004. Id. ¶ 85. Although it alleges that "the Plan contemplated using RTV chargebacks to reduce shrink," id., the amended complaint does not explain why the Plan's projected rise in RTV benefits could not have come from increased processing of legitimate chargebacks.

The Plan also described the gross margins for the Northwest Division and included a line item for "Vendor Income (Rebates)." Id. ¶ 86. The Plan forecast an increase in this line item from 4.5% in 2001 to 5.2% in 2004. According to CW1, "'Vendor Income (Rebates)' was initially referred to as vender income, but it was then changed and a word was added to not draw any attention to it, the change was called Vender Income (Rebates)." Id. ¶ 87 (alteration omitted). CW1 explained that Home Depot did not "do a lot of rebates . . . so it's easy to see what they were doing." Id. "[T]he implication," the amended complaint suggests, is "that the Company accounted for the illicit RTVs as 'Vender Income (Rebates)' so that the actual artificially inflated earnings and operating margins would correspond with budgeted amounts." Id.

Notably, the amended complaint does not cite the Plan itself; instead, it relies entirely on CW1's recollection of the Plan. Moreover, other than the vague statement that the "Company published" the Plan "in or around 2001," id. ¶ 84, the amended complaint does not explain who wrote it, how it was distributed to employees, or who received it.

The other five confidential witnesses, whom the complaint labels CW2 through CW6, were former store-level employees who worked at various Home

21

Depot stores throughout the country. The amended complaint's allegations

regarding their statements include the following:

- CW2 worked as an <u>RTV clerk</u> "directly responsible for processing RTV chargebacks" at three Home Depot stores in New York State from August 1999 to May 2001. <u>Id.</u> ¶ 60. According to CW2, RTV chargebacks were "constantly inflated," <u>id.</u> ¶ 61, and he estimated that 30% - 40% of the chargebacks were fraudulent. Based on this estimate, the amended complaint alleges that the fraud generated "nearly $1 million annually in pure profit" from "just . . . two stores." <u>Id.</u> ¶ 63.

- CW3 worked as a <u>receiving associate</u> and then as an <u>RTV clerk</u> at one Home Depot store in Colorado from May 2002 through June 2004. CW3 stated that "phony RTV chargebacks occurred throughout his/her employment," <u>id.</u> ¶ 64.

- CW4 worked as an <u>RTV clerk</u> at three Home Depot stores in Connecticut from 1993 to 1996. According to CW4, "management . . . instituted a quota which mandated that RTV clerks charge a certain dollar value of RTVs. . . . [T]o fufill the quota Home Depot stores processed fraudulent RTVs throughout the period of his employment." <u>Id.</u> ¶ 67.

- CW5 worked at seven different Home Depot stores in California from 1986 to 2002 as, among other things, a <u>department manager</u> and a <u>store manager</u>. CW5 stated that "RTVs were fraudulently processed to artificially inflate the Company's financial results." <u>Id.</u> ¶ 71. According to CW5, "Home Depot policy" required store managers to keep shrink to 1.5% or less on pain of termination. <u>Id.</u> ¶ 73. To meet this low figure, "stores recaptured shrink by processing fraudulent RTV chargebacks." <u>Id.</u> Moreover, the stores where CW5 worked would distribute lists of what each vendor would and would not inspect, and "the Company's goal was to reach (but not exceed) the limit of the vendors' allotted RTVs." <u>Id.</u> ¶ 74. "[T]o reach this quota the Company stuffed the RTVs with merchandise that was not defective but instead was missing as a result of shrink." <u>Id.</u>

- Finally, CW6 worked as an <u>assistant RTV clerk</u> at a Home Depot store in Massachusetts from November 2003 through August 2005 and "recounted similar fraudulent misconduct." <u>Id.</u> ¶ 75. CW6 estimated that "10 to 20 percent" of the "hundreds of thousands of dollars in chargebacks per month" were "questionable." <u>Id.</u> ¶ 79. Both CW6 and the main RTV clerk at CW6's store quit because they were concerned about "abusive RTV chargebacks." <u>Id.</u> ¶ 76.

## 2. <u>Newspaper Articles</u>

The amended complaint also cites a number of articles published in the <u>New York Post</u> in 2005 and 2006. Two published in August 2005 and a series published in the fall of 2006 are worth mentioning. First, an article published August 4, 2005 describes an RTV-chargeback related memo sent to store managers by defendant Larry Mercer. According to the article, this so-called "Mercer Memo," dated April 19, 2002, "discussed 'missed RTV dollars' and pinpointed specific categories . . . that had the greatest opportunity to boost chargebacks." <u>Id.</u> ¶ 81 (emphasis omitted). The memo estimated that companywide Home Depot could boost chargebacks by $59 million.

Notably, the amended complaint does not cite or quote from the memo itself. Instead, it relies on the <u>New York Post</u> article and CW5, the only confidential witness who is alleged to have seen it. According to CW5, after his store received the Mercer Memo, "every department manager spent an hour each week assisting the RTV clerk with processing RTV chargebacks." <u>Id.</u> ¶ 82.

23

CW5's store manager at the time told his subordinates that "'here's a great opportunity to capture the loss,' which CW5 understood meant to increase RTV chargebacks, regardless of whether they were legitimate or not[.]" Id. CW5 also stated that in the five months following the Mercer Memo, "RTV chargebacks increased by approximately 25%" at his store. Id. ¶ 83. Although CW5 claimed to have a "vivid recollection" of the memo, id. ¶ 82, he did not explain what the memo said, and he did not say that the memo itself directed store managers to process fraudulent RTV chargebacks. Thus, as to the content of the memo, the amended complaint relies entirely on a very brief summary contained in the New York Post article.

Second, an August 15, 2005 newspaper article reported that "[a] senior Home Depot official" acknowledged that "management" had been aware of the allegedly fraudulent chargeback schemes "for at least 19 months, when a memo dated February 12, 2004, was circulated by the corporate office that outlined procedures for collecting chargebacks from suppliers." Id. ¶ 88. Notably, the "senior official" is not named, his position is not provided, and no indication is given about his proximity to the offending conduct. Indeed, based on the allegations in the amended complaint, the article says nothing at all about the basis

24

of the unidentified "senior official's" knowledge, nor does it state that he was even employed by Home Depot when the memo was distributed.

Third, a series of newspaper articles published in 2006 detailed the investigation and termination of various Home Depot managers responsible for inventory management. A <u>New York Post</u> article published on September 7, 2006 claims that "[a]uditors descended on stores in Washington, D.C., Virginia, Maryland, Pennsylvania and New York this summer. . . . A focal point was whether employees had been given a weekly percentage target for RTV claims." <u>Id.</u> ¶ 115. According to the amended complaint, the story names two district managers who were fired and two store managers who were placed on administrative leave as "part of an ongoing internal investigation into allegations of improper vendor chargebacks[.]" <u>Id.</u> The only source cited for these statements is Natasha Williams, one of the store managers placed on administrative leave, who by that time had filed a discrimination lawsuit against Home Depot. <u>Id.</u> ¶¶ 115-16. The article does not explain how Williams (or any other unnamed source) learned of the extent of the investigation or of the purported reasons behind the firings.

A follow-up newspaper article published on October 16, 2006 discusses the termination of four store managers and a district manager in Pennsylvania,

25

Maryland, and Washington, D.C., and observed that "the recent blood-letting doubles to 10 the number of Home Depot employees who have lost their job as a result of the [RTV-chargeback] inquiry." Id. ¶ 117. The article says that "all but one of the employees . . . were let go as a result of the on-going probe," id., but, at least according to the allegations in the amended complaint, it provides no basis whatsoever for this statement.[1]

### 3. Internal Home Depot Documents

In addition to the memos referred to in the New York Post newspaper stories, the amended complaint cites several documents describing the "Back-End Automation & Re-Engineering" ("BEAR" for short) system, a new system Home Depot developed to process RTV chargebacks. See id. at ¶¶ 90-95. Among other things, the memos identify the RTV process as "a critical focus area for 2004 and 2005," and promised "more comprehensive policies" and "consistent, accurate RTV policy execution in stores." Id. ¶¶ 92, 93 (emphasis omitted). Moreover, under the new system, "the Home Depot RTV Associate and Supplier

---

[1] The remaining New York Post articles say: (1) at least three Home Depot employees claim to have been retaliated against for refusing to process fraudulent chargebacks; (2) Raymond Hammond, a "former Home Depot subcontractor," ACAC ¶ 110, stated that RTV abuse happened routinely at all five upstate New York Home Depot stores he worked at from 1999 to 2001; and (3) "a West Coast member of a[n] RTV team" said that "the questionable practices took place in stores in his region as well," id. ¶ 118 (quotation marks omitted).

26

Representative will no longer be able to override negotiated policies." Id. ¶ 93 (emphasis and brackets omitted).

### 4. Whistleblower Complaint

On June 30, 2005, Michael Davis, a former Home Depot employee, filed a Sarbanes-Oxley whistleblower complaint with the Department of Labor. See 18 U.S.C. § 1514A. Davis worked as, among other things, a loss prevention officer and an RTV clerk at one Home Depot store in Maryland from October 1997 until he was fired in March 2005. Davis's complaint alleged that beginning in 2000 store management instructed RTV clerks to process RTV chargebacks for merchandise that was "never defective, damaged, or returned to the store." Id. ¶ 103. Moreover, Davis's complaint claimed that "[c]ompany management would circulate memos telling personnel to use RTVs instead of markdowns. . . . These memos came from another store, the Atlanta home office, and the Paramus, New Jersey office in some cases setting dollar value store goals, dollar value regional goals and a companywide goal of $59 million." Id. (emphasis omitted). And in 2004, Davis "was given a package from District Loss Prevention Manager Alan Wells explaining, on a company-wide basis, that RTV clerks could generate dollars for the store, the region, and companywide." Id. (emphasis and brackets omitted).

Still another New York Post article published on January 20, 2006, says that during a deposition in Davis's whistleblower case, one of Davis's former co-workers, Donald Moyer, testified that a physical count of the inventory at a Home Depot store in Maryland produced a number that exceeded the inventory on its records by $1 million. Id. ¶ 107. The amended complaint does not cite Moyer's testimony itself, relying instead on the New York Post's account of it. According to the newspaper, Moyer said that Home Depot's corporate office sent a team to investigate the discrepancy, and "[t]hey determined that the extra inventory was the result of inflated RTV dollars." Id. A second New York Post article, published on April 14, 2006, reports that Davis said that RTVs might rise to $35,000 per week around the busy Christmas season, but would soar to $80,000 per week "[i]n the weeks leading up to the stores' bi-annual inventory audit." Id. ¶ 109.

### 5. SEC Inquiry

Finally, the amended complaint alleges that the Securities and Exchange Commission opened an "informal inquiry" into Home Depot's RTV chargeback practices. Id. ¶ 119. In addition, a reporter for CNBC discussing the SEC inquiry observed that Michael Davis -- the whistleblower complainant -- claimed that his store processed $25,000 of improper charges per week. According to the

commentator, "[t]hat is about $1.3 million. Extending that out to all the stores in the Home Depot empire and you are talking more than $1 billion . . . ." Id. ¶ 120 (emphasis omitted). Notably, however, the amended complaint does not explain what prompted the investigation, the scope of the investigation, who the SEC talked to, or, most importantly, the results of the inquiry. Simply put, the only fact of substance alleged in the amended complaint is that at some point the SEC looked into Home Depot's RTV chargeback practices.

B.

Bucks County, as lead plaintiff for a putative class of investors who purchased Home Depot common stock between May 29, 2001 and February 22, 2005 (the day Home Depot released its results for the fourth quarter of 2004), alleges that Home Depot's failure to disclose the RTV chargeback scheme in its financial statements and press releases from 2001 through February 2005 amounted to securities fraud under Section 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 U.S.C. § 240.10b-5. In other words, investors looked at the company's financial statements and press releases and reasonably believed the numbers reflected legitimate transactions, rather than results inflated by theft from vendors. After describing at length the press releases and financial reports containing the alleged misrepresentations and

29

omissions, see ACAC ¶¶ 123-218; see also 15 U.S.C. § 78u-4(b)(1)(B) (requiring

a securities fraud class action complaint to "specify each statement alleged to have

been misleading [and] the reason or reasons why the statement is misleading");

Fed. R. Civ. P. 9(b) (requiring allegations of fraud to be pleaded with

particularity), the amended complaint alleges that all of these public statements

were

> false or misleading when made because they misrepresented or omitted the following material adverse facts that the Defendants knew at the time the statements were made:
>
> a. That during [the relevant fiscal year], Home Depot was engaged in a scheme to inflate the Company's earnings through fraudulent RTV practices;
>
> b. That during [the relevant fiscal year], Home Depot derived a material portion of its revenues and profits from fraudulent RTV practices;
>
> c. That the Company had failing and deficient internal controls and procedures and lacked any meaningful ability to accurately report its financial results;
>
> d. That the Company's improper RTV practices were in direct violation of its own code of conduct; and
>
> e. That the Company's illicit scheme vis-a-vis fraudulent RTV practices potentially subjected Home Depot to substantial regulatory fines, penalties and other legal action, thereby compromising the Company's overall financial condition and prospects.

ACAC ¶¶ 142, 170, 198, 219.  The amended complaint also alleges that the misrepresentations in Home Depot's SEC filings violated various Generally Accepted Accounting Principles.  See id. ¶ 224.

According to the amended complaint, Home Depot's stock price was artificially inflated "as a direct result of the fraudulent scheme."  Id. ¶ 261.  But Home Depot is said to have stopped the scheme in the fourth quarter of 2004.  As a result, the company met (but failed to exceed) analysts' expectations for that quarter.  Following the fourth quarter earnings announcement, Home Depot's stock price fell.  Bucks County says this share-price drop was "a direct and forseeable consequence of Defendants' failure to disclose and their concealment of, inter alia, the true state of the business operations and financial condition of Home Depot."  Id. ¶ 276.

## C.

In addition to naming Home Depot, Inc. as a corporate defendant, Bucks County attempts to pin responsibility for the alleged fraud on six high-ranking Home Depot officials whom it also names as defendants: Robert Nardelli, Carol Tomé, Larry Mercer, Kenneth Langone, Berry Cox, and John Clendenin.  The amended complaint summarizes their positions within Home Depot this way:

- Robert Nardelli became the President and Chief Executive Officer of Home Depot in December 2000 and Chairman of the Board of Directors in January 2002. He retained those positions throughout the class period.

- Carol Tomé became Home Depot's Chief Financial Officer and an Executive Vice President of the company in May 2001 and held those positions throughout the class period. Previously, she was a Senior Vice President of Finance from February 2000 to May 2001 and Vice President and Treasurer from 1995 to 2000.

- Larry Mercer was Home Depot's Executive Vice President of Store Operations from the beginning of the class period until he retired in August 2002. Following his retirement, Mercer served as an advisor to Nardelli until February 2004.

- Kenneth Langone is one of the co-founders of Home Depot and has served on its Board of Directors since 1978. During the class period, Langone served as Home Depot's "Lead Director," a position that required him to "act[] as a liaison between non-management directors . . . and Company management . . . , chair[] executive sessions of non-management directors," and consult with the Chairman of the Board (Nardelli) on various matters. ACAC ¶ 23. Throughout the class period, Langone was also a member of the Board's Executive Committee and its Nominating and Corporate Governance Committee, which "is responsible for, inter alia, overseeing the Company's corporate governance practices and procedures." Id. ¶ 24. Finally, Langone served on the Board's Audit Committee for the 2004 fiscal year.

- Berry Cox was a member of Home Depot's Board from 1978 to June 2005. He was Chairman of the Board's Audit Committee from the beginning of the class period until August 2002.

- John Clendenin joined the Home Depot Board in 1996. In 2002, he took over Cox's position as Chairman of the Audit Committee and held that position throughout the remainder of the class period.

32

IV.

With this background, we turn to the critical question: whether the amended complaint, taken as a whole, creates a "strong inference" -- one that is "cogent and compelling" -- that the individual defendants acted with the required scienter. We hold that it does not.

To begin with, we agree with the district court's observation that the amended complaint's allegations, if accepted as true, establish that Home Depot stores processed improper RTV chargebacks. Thus, for example, the confidential witnesses describe RTV-chargeback fraud occurring at Home Depot stores throughout the Northwest and at particular stores in California, Colorado, New York, Connecticut, and Massachusetts. Although we do not know the names of these witnesses, the similarity of the fraudulent schemes they describe supports the claim. Moreover, five of the witnesses were either RTV clerks or store managers, positions that might have exposed them to their stores' RTV-chargeback practices on a regular basis.[2] Thus, the amended complaint provides an adequate foundation

---

[2] The only confidential witness who was not a store-level employee is CW1, who managed the 300 stores of Home Depot's Northwest Division from 1997 to 2003. Although the amended complaint alleges that CW1 said RTV fraud was "'common place' at Home Depot throughout the course of his/her employment," ACAC ¶ 54, it does not explain the basis of his knowledge. The amended complaint does not allege, for example, whether CW1 based his opinion on personal observations he made during trips to Home Depot stores, or instead just repeated scuttlebutt he overheard around the office.

for their statements.  Moreover, the allegations in the amended complaint also support the suggestion that the fraud may have lasted several years.  Specifically, CW1, CW2, CW3, CW5, CW6, and Raymond Hammond, a Home Depot subcontractor, all reported fraud occurring at various times between 2001 and the fourth quarter of 2004.

But simply alleging that a widespread fraud may have occurred is not enough.  Because scienter is an essential element of a securities fraud claim, Bucks County's allegations must create a <u>strong inference</u> -- again, one that is "cogent and compelling" --  that the individual defendants knew about the alleged fraud (or were severely reckless in not knowing about it) when they made the purportedly false or misleading statements.  In other words, to state a claim against the individual defendants, Bucks County also must allege facts from which a reasonable person <u>would</u> infer that it is at least as likely as not that the individual high-ranking defendants either orchestrated the alleged fraud (and thus always knew about it), or learned about the alleged fraud sometime before the fourth quarter of 2004, or were otherwise severely reckless in not learning of the claimed fraud during that period.  Like the district court, we are convinced that the amended complaint falls short.

A.

At the outset, we note that the amended complaint relies exclusively on the widespread nature of the fraud, and the purported amount of the fraud, to draw a strong inference that the individual defendants (all high-ranking officials) acted with the requisite scienter. Thus, there are no claimed e-mails or letters from any of the individual defendants expressly ordering or even suggesting that Home Depot employees process fraudulent RTV chargebacks; nor do any of the confidential witnesses say that any one of the individual defendants ever discussed the alleged fraud or even knew about it. Indeed, none of the confidential witnesses even claims to know or have so much as ever met any of the six individual defendants. Although Bucks County views the so-called Mercer Memo and the 2001 Strategic Operating Plan referred to by CW1 as direct evidence of fraudulent intent, we are not persuaded.

Taking the Mercer Memo first, it is important to point out that the amended complaint does not quote the memo itself. Rather, it relies entirely on what the New York Post said about it. And according to the amended complaint, the newspaper did not say much, because the article is alleged to have reported only that the memo "discussed 'missed RTV dollars,'" "pinpointed specific categories . . . that had the greatest opportunity to 'boost chargebacks,'" and "estimate[d]

35

that, on a companywide scale, Home Depot could boost RTV chargebacks by more than $59 million[.]" ACAC ¶ 81 (emphases omitted). Notably, the amended complaint is careful never to say that the memo itself orders employees to engage in RTV fraud. Indeed, based on the descriptions of it in the amended complaint, nothing in the memo indicates fraud. Instead, the newspaper article's recitation of the memo appears to instruct store managers to look closely at RTVs to ensure that employees maximize <u>legitimate</u> chargebacks. There is nothing sinister about management highlighting areas where employees can legitimately save the company money.

Moreover, to assign a fraudulent intent to the memo, the amended complaint relies on how a single employee (CW5) interpreted his store manager's comment about it:

> According to CW5, the store manager . . . told the assistant and department managers that "here's a great opportunity to capture the loss," which CW5 understood meant to increase RTV chargebacks, regardless of whether they were legitimate or not, in order to reduce shrink.

ACAC ¶ 82. A single employee's interpretation of his manager's facially innocuous comment about a document says precious little, if anything, about the knowledge or intent of the drafter of the memo (Mercer), not to mention the rest of the individual defendants, who are referenced in no way by CW5, or by anyone

else.  In our view, the Mercer Memo does not amount to direct evidence that the individual defendants orchestrated or even knew about the alleged fraud and did nothing.

Bucks County's strained inferences from the 2001 Strategic Operating Plan are similarly unconvincing.  Once again, Bucks County does not quote the Plan itself.  Rather, the amended complaint relies on CW1's brief summary of it.  From CW1's thumbnail sketch, Bucks County focuses on two aspects of the Plan that allegedly raise suspicion.  First, Bucks County notes ominously that the Plan "contemplated using RTV chargebacks to reduce shrink."  ACAC ¶ 85.  But there is nothing wrong with using legitimate RTV chargebacks to reduce shrink, so this aspect of the Plan does not amount to anything suspicious at all.  Second, the Plan set actual and targeted financial goals for the Northwest Division.  Among these goals was an amount for "Vender Income (Rebates)."  According to CW1, "'Vendor Income (Rebates)' was initially 'referred to as vendor income, but it was then changed and a word was added to not draw any attention to it, the change was called Vendor Income (Rebates).' . . . '[W]e don't do a lot of rebates at Home Depot, so it's easy to see what they were doing.'" ACAC ¶ 87.  From this muddled explanation, Bucks County infers that Home Depot somehow "accounted for the

illicit RTVs as 'Vendor Income (Rebates)' so that the actual artificially inflated earnings and operating margins would correspond with budgeted amounts." Id.

First off, there is no information about who wrote the Plan or who received it. More importantly, CW1's description of it is so vague that the allegations about it are not particularized as required by the PSLRA. Specifically, we cannot tell what "rebates" in this context means, nor do we know what in CW1's view constitutes "a lot" of them. All of these gaps in the amended complaint's description of the Plan undermine any inference of scienter that Bucks County hopes to draw from it. See Garfield, 466 F.3d at 1265 (concluding that allegations about what was said at a meeting involving senior executives was insufficiently particularized where the complaint "failed to allege what was said at the meeting, to whom it was said, or in what context"). Moreover, nothing in the amended complaint's description of the document suggests that the "rebates" referred to in the Plan were anything other than legitimate rebates. Instead, the amended complaint relies entirely on CW1's inference from a single change in terminology. But CW1 does not explain how he knows the name was even changed, and, more importantly, we do not see how so much can be read only into the label placed on a column heading. In short, we do not think the 2001 Strategic Operating Plan

does very much to establish scienter either, let alone afford a cogent and compelling inference of scienter.

Of course, the lack of direct evidence connecting the defendants to the alleged fraud is not fatal, because plaintiffs may create a "strong inference" of scienter by circumstantial evidence alone. See Tellabs, 127 S. Ct. at 2510 (explaining that the plaintiff need not provide allegations "of the 'smoking-gun' genre"). Thus, the question before us boils down to whether a reasonable person would infer that there was at least a fifty-fifty chance that the individual defendants knew about the alleged fraud (or were severely reckless in not knowing about it) based on its nature, duration, or amount. The district court said "no," and so do we.

B.

We begin by rejecting Bucks County's assertion that the widespread nature or duration of the fraud leads to a strong inference that it was "orchestrated at corporate headquarters." ACAC ¶ 239. Bucks County relies on the common-sense notion that large numbers of people do not often think of the same idea at roughly the same time without talking to each other. Thus, if some Home Depot stores in varying parts of the country engaged in the same kind of fraud during overlapping time frames, then, the argument goes, it is likely that someone

39

overseeing the entire company, such as senior management like Nardelli, Tomé, and Mercer, devised the fraud and ordered lower-level employees to execute it. Although this argument has some surface appeal, we see three reasons why it breaks down here.

First, the alleged fraud appears to have been a simple one, and, if it occurred, plainly did not require the participation of upper management, let alone the CEO or the CFO of the company. The more complex an idea, the less likely it is that many people will stumble onto it simultaneously. So if the fraud alleged here were complex, then it would be more likely that it originated from one or a few persons at the top of Home Depot, as opposed to a number of store managers devising the scheme themselves. Likewise, certain types of fraud, such as sophisticated, Enron-style accounting frauds, undeniably require the participation of senior management -- these frauds simply cannot be carried out by low-level employees acting on their own. But the fraud alleged here was very simple: store employees simply told vendors that perfectly good merchandise was damaged. Because vendors with destroy-in-field provisions in their contracts did not check these claims, the alleged fraud required no elaborate cover-up or fancy accounting tricks. The purportedly damaged items were simply thrown out or left on the shelves to be sold. The simplicity of the fraud and the fact that it could be

completed without the involvement of any upper management officials tend to undermine the inference that it must have originated with senior Home Depot officials, rather than with store-level employees.

Second, if Nardelli, Tomé, and Mercer -- three of the most senior officials at Home Depot -- orchestrated the fraud, presumably they would have communicated their instructions either through regional managers, such as CW1, or store managers, such as CW5. But neither CW1 nor CW5 so much as mentions any conversation or directive coming from the individual defendants (or from anyone else for that matter) ordering them to commit RTV fraud or instructing them on how to do it. The allegations based on statements by CW1 are particularly striking in this regard. Although the amended complaint devotes several pages to recounting his statements, see ACAC ¶¶ 54-58, 84-87, CW1 never once says that anyone above him on the corporate ladder discussed RTV fraud with him or demanded that he order his stores to engage in it. Simply put, if Nardelli, Tomé, Mercer, and other officials at "corporate headquarters" orchestrated the fraud, CW1 would have known this and said so explicitly, but he never said that. Indeed, the amended complaint fails to cite even one communication of any kind from the individual defendants (or any other high-ranking Home Depot official) that could reasonably be interpreted as ordering or even encouraging RTV fraud. The

41

absence of these types of allegations weighs strongly against the inference that the named defendants or other very senior Home Depot officials orchestrated the fraud.

Third, the amended complaint's allegations suggest that some store managers orchestrated the fraud in order to meet aggressive company targets for reducing shrink. In particular, CW5, who managed a Home Depot store in California, said that "Home Depot policy" required store managers to keep shrink to 1.5% or less on pain of termination. Id. ¶ 73. To meet this standard, CW5 stated, "stores recaptured shrink by processing fraudulent RTV chargebacks." Id. These allegations may suggest that a store manager may have orchestrated RTV fraud, rather than senior management. The most plausible inference to draw from the amended complaint's allegations, taken together, is that the RTV fraud began at the store level in response to pressure on store managers to reduce shrink.

That conclusion does not end our inquiry, however, because even if the named defendants did not orchestrate the fraud, it is possible they could have learned about it sometime before the fourth quarter of 2004. And that knowledge, Bucks County suggests, would make their public statements not only false, but fraudulent as well. But once again, Bucks County cites no documentation, communication, or conversation suggesting that the high-ranking defendants knew

42

anything about the alleged fraud.  Rather, Bucks County argues only that, based on the breadth and amount of the fraud and Home Depot's decision to overhaul its RTV processing system in 2004, the individual defendants <u>must have known about it</u>.

To begin with, we indulge at least some skepticism about allegations that hinge entirely on a theory that senior management "must have known" everything that was happening in a company as large as Home Depot, which operates over 2000 stores.  ACAC ¶ 14. The amended complaint, therefore, must at least allege <u>some</u> facts showing how knowledge of the fraud would or should have percolated up to senior management.  The amended complaint does not come close to accomplishing that task.  In particular, Bucks County's "must have known" theory fails because the alleged amount of the fraud is wholly speculative, the type of fraud alleged would be very difficult for senior management to detect, Bucks County alleges no suspicious stock sales by management, and Home Depot's 2004 overhaul of its RTV processing system does not suggest knowledge of widespread fraud.

1. <u>The amount of the fraud is speculative</u>.  First, Bucks County asks us to infer that the fraud approached $1 billion per year, a figure that Bucks County contends is so large that any senior executive either knew about it or was severely

43

reckless in not discovering it. There are two problems with this argument. For one thing, although surely a significant sum, $1 billion represents less than 2% of Home Depot's annual sales, which amounted to $53.6 billion in fiscal year 2001 and rose to $64.8 billion in fiscal year 2003. ACAC ¶¶ 139, 194. This is not a case where allegedly fraudulent transactions amounted to an overwhelming percentage of the corporation's business. Compare In re Suprema Specialties, Inc. Secs. Litig., 438 F.3d 256, 278-79 (3d Cir. 2006) (concluding that a strong inference of scienter existed where, among other things, the complaint alleged that "fictitious transactions . . . constituted more than two-thirds of the company's revenue") (quotation marks omitted, emphasis added) with In re Alpharma Inc. Secs. Litig., 372 F.3d 137, 151 (3d Cir. 2004) (concluding that no strong inference of scienter existed where the complaint, which relied on fraud occurring at a subsidiary, was "devoid of any allegations which would establish that [the subsidiary] was so central to Alpharma's business that its increased revenue figures should have received particular attention from company executives").

Far more importantly, the PSLRA requires plaintiffs to plead with particularity the facts supporting a "strong inference" of scienter, but the amended complaint contains precious little of substance about the total amount of the alleged fraud. Indeed, Bucks County appears to rely entirely on the estimate of

44

only one store employee (CW2), an RTV clerk, who allegedly observed fraud occurring at only two stores and estimated that the fraud at these two stores together amounted to $1 million annually.  See ACAC ¶ 63.  CW2's statements tell us absolutely nothing about the amount of fraud at other stores, yet Bucks County apparently calculates its $1 billion figure simply by multiplying CW2's per-store number ($500,000) by the total number of Home Depot stores (approximately 2,000).  Likewise, the CNBC commentator cited in the amended complaint relied entirely on whistleblower Michael Davis's estimate of $25,000 per week at one store to make a quick, back-of-the-envelope guess of more than $1 billion for the entire company.  See id. ¶ 120. Simply put, estimates of fraud occurring at one or a few stores, like the estimates provided by CW2 and Davis, are far too shaky a foundation on which to make any reasonable calculus of the total amount of the fraud.  Thus, even assuming the fraud was widespread, we have no reliable way of estimating its total amount, let alone inferring from the dollar amount the knowledge of senior management.

2.  The type of fraud alleged would be difficult for senior management to detect.  The fraud in this case involved some Home Depot employees lying to some vendors to obtain excessive rebates.  As we have already explained, the fraud was simple and did not require employees to make phantom entries on Home

Depot's books or engage in other kinds of sophisticated accounting cover-ups. Rather, the rebates from vendors really were flowing into Home Depot's coffers, so there was no lack of actual cash flow that would have raised a red flag among company executives or auditors. See Garfield, 466 F.3d at 1266-67 (concluding that the complaint failed to create a strong inference of scienter because, among other things, it contained "no allegations . . . that indicate the presence of . . . 'red flags' in the company's financial statements"). Likewise, the amended complaint does not allege that Home Depot's RTV rate was extremely high compared with other companies. On the basis of what is contained in the amended complaint, there appears to be no accounting red flag that would have tipped off the individual defendants to their subordinates' allegedly fraudulent activity.

The lack of accounting red flags also undermines Bucks County's argument that scienter can be inferred from the fact that the individual defendants were required to certify Home Depot's financial statements under the Sarbanes-Oxley Act. In Garfield, we held that "a Sarbanes-Oxley certification is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements." 466 F.3d at 1266. A certifier would be severely reckless, Garfield held, only if he "had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red

46

flags,' that the financial statements contained material misstatements or omissions." Id. Because no such glaring "accounting irregularities" or "red flags" are present here, the Sarbanes-Oxley certifications by the individual defendants do not support an inference of scienter.

Even though an examination of Home Depot's financial statements would not have revealed the alleged RTV fraud, it conceivably might have been detected by inventory checks that counted more merchandise on a store's shelves than on its books. Ordinarily, shrink causes a store's actual inventory to be lower than the inventory recorded on its books. But if an inventory revealed that a store's book figure was lower than its actual inventory, then the auditors would be on notice that something was wrong. The amended complaint alleges that each of Home Depot's 2000 stores was inventoried twice per year, see ACAC ¶¶ 107, 109, yet only one time was such a discrepancy discovered. One problematic inventory would not put upper management on notice of widespread and pervasive fraud.

Moreover, the amended complaint is unclear about when this troubling audit occurred. Citing only a New York Post article, which in turn quotes statements made by an employee at a Maryland Home Depot store, the amended complaint states that a "2004 audit" of one store revealed $1 million in excess inventory. Id. ¶ 107. But the article was published in 2006 and goes on to say that the auditors

47

discovered the discrepancy "[l]ast year." Id. At best, this newspaper account supports the inference that one inventory produced an anomalous result one time at the very end of the class period. As the same paragraph in the amended complaint states, it was only after the discrepancy was discovered that "the corporate office sent a team to investigate." Id. According to an employee quoted in the New York Post article, that team (presumably at some later date) "determined that the extra inventory was the result of inflated RTV dollars." Id. This allegation does nothing to bolster the claim that the defendants knew about the fraud during the class period, because the audit almost certainly did not reach its conclusions about RTV fraud until after Home Depot released its results for the fourth quarter of 2004. Indeed, the lack of evidence about similar discrepancies in earlier inventories supports the more likely inference that management was not aware of the problem.

Still another way senior managers could have learned of the fraud would be through the complaints of whistleblowers. Although the amended complaint discusses complaints by three whistleblowers, it makes no claim that any of the senior-management defendants learned of these complaints before Home Depot released its fourth quarter financial information in February 2005. For example, Michael Davis, a former Home Depot employee, did not file his Sarbanes-Oxley

48

whistleblower complaint until June 2005.  See ACAC ¶ 101.  Quite simply, the amended complaint affords no basis for inferring that the individual defendants would have heard about these whistleblower complaints during the class period. Moreover, nothing in the vague stories published by the New York Post provides a sufficiently cognizable and detailed basis for inferring that internal complaints by employees alerted senior management to the alleged fraud.

Finally, senior managers perhaps could have learned of the alleged fraud from unhappy vendors who contacted Home Depot to complain about excessive RTV chargebacks.  But once again, the amended complaint makes no mention of even a single vendor who complained to anyone at Home Depot, let alone complained to senior management.

The alleged RTV fraud produced no accounting red flags, and the amended complaint strongly suggests that management would not have learned about it from inventory checks, whistleblower complaints, or vendors.  Simply put, the evidence  recited in the allegations is far from yielding a "strong inference" of scienter.

3.  No suspicious stock sales occurred.  Moreover, as many courts have held, the timing of stock trades by insiders also may be relevant to inferring scienter.  Stock sales or purchases timed to maximize returns on nonpublic

information weigh in favor of inferring scienter; the lack of similar sales weighs against inferring scienter. Compare In re Navarre Corp. Secs. Litig., 299 F.3d 735, 747 (8th Cir. 2002) (explaining that stock sales are suspicious when "the level of trading is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information") (quotation marks omitted) with Pugh v. Tribune Co., 521 F.3d 686, 695 (7th Cir. 2008) ("Tellabs instructs us to consider all potential inferences, and the fact that the defendants are not alleged to have sold the stock at the inflated prices meant that they stood to lose a lot of money if the value of Tribune's stock fell."). In this case, the amended complaint says nothing about suspicious stock transactions by any of the individual defendants, an omission that weighs against inferring scienter.[3]

4. Home Depot's 2004 overhaul of its RTV processing system does not suggest fraud. In 2004, Home Depot implemented a new automated system -- the BEAR system -- for handling RTV chargebacks. According to Bucks County, Home Depot never would have designed and implemented BEAR unless it knew that a large, on-going fraud was occurring and wanted to stop it. Thus, Bucks

---

[3] We emphasize that suspicious stock sales are not necessary to create a strong inference of scienter. See Tellabs, 127 S. Ct. at 2511. Instead, the presence or absence of such allegations must be assessed in light of all of the allegations found in the complaint.

County says, senior executives at Home Depot must have known about the fraud at least as early as 2003, when they began work on BEAR, and their failure to disclose that knowledge amounts to a violation of the securities laws. We remain unpersuaded.

Large corporations like Home Depot make incremental improvements to their business operations all the time, and, from the amended complaint, BEAR appears to be nothing more than that. The Home Depot documents quoted in the amended complaint, which were written in 2003 and 2004, say that implementing BEAR would result in "more comprehensive policies" and "consistent, accurate RTV policy execution," and that store employees "will no longer be able to override negotiated policies." ACAC ¶ 93. Moreover, "[t]he enhanced integral reporting and metrics will help Home Depot to reinforce desired behaviors and allow performance tracking to drive future improvements." Id. ¶ 95. Cutting through the jargon, these statements appear to say nothing more than that Home Depot is trying to create a more centralized system for handling RTV chargebacks. We do not believe that reasonable people would infer very much from the design and implementation of a system that appears to do little more than increase management's control and improve management's access to information.

51

In short, the amended complaint contains no allegations directly linking the named defendants to the RTV fraud, and the allegations about the geographic scope, duration, and amount of the alleged fraud are insufficient to create a "strong inference" (meaning a "cogent and compelling" one) that the individual defendants orchestrated the fraud, knew about it, or were severely reckless in not knowing about it. Accordingly, the district court was right to dismiss the § 10(b) and Rule 10b.5 claim against the individual defendants under the heightened pleading standards unambiguously imposed by Congress in the PSLRA.

Even though it failed to plead scienter adequately for any of the individual defendants, the amended complaint could, in theory, still create a strong inference that the corporate defendant, Home Depot, Inc., acted with the requisite state of mind. Corporations, of course, have no state of mind of their own. Instead, the scienter of their agents must be imputed to them. See, e.g., Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 195-96 (2d Cir. 2008); Tellabs, 513 F.3d at 708-10; Southland Secs. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 366 (5th Cir. 2004). Because the allegations in this case relate to allegedly fraudulent public statements, we "look to the state of mind of the individual corporate official or officials who make or issue the statement (or

52

order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like)[.]" Southland Secs., 365 F.3d at 366.

Here, however, Bucks County does not argue that any Home Depot officials were responsible for the company's financial statements other than the named individual defendants. In other words, Bucks County does not argue that, even if the amended complaint fails to raise a strong inference of scienter as to any of the individually named defendants, it does raise a strong inference that somebody responsible for the allegedly misleading statements must have known about the fraud. For that reason alone we need not pursue this issue further. See Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989) (arguments not made are waived). But in any event, the amended complaint does not create any inference, let alone a strong one, that unnamed Home Depot officials were both responsible for issuing the allegedly false public statements and were aware of the alleged fraud. Accordingly, we are constrained to affirm the dismissal of the § 10(b) and Rule 10b-5 claim against Home Depot, Inc.

Because Bucks County failed to adequately plead a violation of § 10(b) and Rule 10b-5 by Home Depot, Inc., its § 20(a) control-person claims against the individual defendants necessarily fail as well. See Garfield, 466 F.3d at 1261;

53

Theoharous, 256 F.3d at 1227.  Thus, we affirm the district court's dismissal of the amended complaint in its entirety.

V.

The only remaining question is whether the district court properly denied Bucks County leave to amend.  Although Bucks County did not submit a proposed amended complaint, its motion for leave cited three newly discovered facts that purportedly bolster the inference of scienter: (1) President and CEO Nardelli resigned less than six weeks after Bucks County filed the amended complaint; (2) in late 2006, Home Depot admitted that its executives had backdated options prior to December 2000; and (3) a July 2004 internal Home Depot report encouraged RTV fraud.  The district court concluded that the additional facts, even when viewed in concert with those alleged in the amended complaint, did not create a strong inference of scienter, and, therefore, denied as futile the motion for leave to amend.  We agree.[4]

---

[4] The district court also noted that Bucks County "failed to attach a proposed amended complaint to their motion to amend, contrary to customary practice in this court."  Doc. 80 at 22. Although submitting a proposed amended complaint is good practice and we highly recommend it, our case law makes clear that failing to do so is not a basis for denying leave to amend.  A motion for leave is sufficient if the motion itself "set[s] forth the substance of the proposed amendment[.]" Long v. Satz, 181 F.3d 1275, 1279 (11th Cir. 1999).  Nevertheless, we affirm the denial of leave in this case because the district court plainly rested its holding on futility, rather than on Bucks County's failure to attach a proposed amended complaint.

Under Fed. R. Civ. P. 15(a)(2), the court "should freely give leave when justice so requires." Because justice does not require district courts to waste their time on hopeless cases, leave may be denied if a proposed amendment fails to correct the deficiencies in the original complaint or otherwise fails to state a claim. See Foman v. Davis, 371 U.S. 178, 182 (1962) (describing "futility" as a basis for denying leave). Since "[t]he text of the [PSLRA] neither purports to affect Rule 15(a), nor . . . require[s] that all dismissals be with prejudice," the normal Rule 15(a) standards apply here. ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 56 (1st Cir. 2008); accord Belizan v. Hershon, 434 F.3d 579, 583-84 (D.C. Cir. 2006).

We find nothing in the three purportedly new facts proffered by Bucks County that would create a strong inference of scienter where none existed before. To begin with, allegations about options backdating that occurred prior to 2001 are simply irrelevant. As far as we can tell, Bucks County included these allegations because some of the backdated options vested during the class period, which, in Bucks County's view, created a motive for Home Depot's senior executives to artificially inflate the company's stock price. But every optionholder (or stockholder for that matter) has an incentive to inflate the company's stock price, irrespective of whether the options in question were backdated. Thus, these allegations simply boil down to the claim that Home Depot executives had a

55

motive to inflate the company's stock price because they held options on Home Depot stock. And as we have already explained, the motive created by stock or option ownership is insufficient to create a strong inference of scienter. Instead, stock or option ownership can create a strong inference of scienter only when combined with suspicious stock sales or purchases. See Part IV(B)(3), supra. Nothing in Bucks County's motion for leave suggests that any of the named defendants (or for that matter anyone else at Home Depot) engaged in suspicious sales or purchases. The backdating allegations add nothing to the amended complaint on the issue of scienter.

Nardelli's resignation is similarly unhelpful to Bucks County. The motion for leave to amend says that Nardelli left the company on January 3, 2007, six weeks after Bucks County filed the amended complaint. Home Depot called Nardelli's departure a resignation, but the motion suggests he was fired. Either way, Bucks County argues that the timing of the termination supports an inference that Nardelli was aware of the RTV scheme. This argument is without merit.

Although the amended complaint was filed just six week prior to Nardelli's departure, the original complaints raising these allegations were filed in May 2006, eight months earlier. Moreover, the motion acknowledges that on December 6, 2006, less than a month before Nardelli's departure, Home Depot publicly

56

disclosed the full extent of the options backdating that occurred from 1981 through November 2000. Based on the timing of these events, the much more plausible inference is that if Nardelli's firing was caused by unlawful conduct, it was the options backdating scandal that did him in, not the alleged RTV fraud underlying this lawsuit. This allegation too, even when viewed collectively with the allegations in the amended complaint, does not create a strong inference of scienter.

Finally, we come to the July 2004 internal Home Depot report. According to the motion for leave, "the Report reveals RTVs exceeded more than 10% of total sales in 11 of 29 stores covered by the Report." Doc. 69 at 6-7. Indeed, "[o]ne store reported that RTVs amounted to more than 29% of that store's sales[.]" Id. at 7. Eighteen of the stores, the report continued, were below the division's average RTV rate. If they had met the average rate, those 18 stores could have processed "an additional $691,000 year-to-date or $1,658,400 annualized." Id. Finally, "[t]he Report also established an overall 'RTV target' of at least 8.8% per store, a rate that significantly exceeded industry standards and bears no relation to the true amount of defective products that a store received from its vendors." Id.

57

Unfortunately for Bucks County, this document does not say what Bucks County claims it says. The "report" is actually a lengthy PowerPoint presentation apparently given to store managers as part of a workshop on how to reduce shrink. The presentation focuses on the 29 worst performing stores in the eastern region and details numerous ways in which those stores can reduce shrink. Better processing of RTV credits is only one of the measures discussed, and only three presentation slides out of thirty are devoted to it. Moreover, contrary to Bucks County's claims in the motion for leave, none of the slides talks about RTVs as a percentage of total sales. Instead, one slide contains a chart breaking down four product categories -- annuals, shrubs/landscaping, mouldings, and magazines -- and compares the stores' shrink percentages across only these four categories.[5] Although the motion suggests that the rates across these specific categories

_____

[5] A close inspection of the PowerPoint presentation shows that the figures represent RTVs for just these four product categories, not total store sales. The critical slide has five main columns labeled "Annuals," "Shrubs/Landsca[ping]," "Mouldings," "Magazines," and "Total." Doc. 70, Ex. A. Within each of these columns are three more columns: "Store," "RTV $," and "%." Thus, for each of the 29 stores profiled, the slide presents the amount of RTVs per product category in dollar and percentage terms, and then adds all four categories together in the "Total" column. Indeed, there can be no doubt that the "Total" column represents the totals for just these four product categories, and not total store sales, because adding up the "RTV $" entries in the four product columns for a given store yields the entry for "RTV $" in the "Total" column for that store. Store 1221, for example, has the following four entries for "RTV $": 1,584 (annuals), 10,585 (shrubs/landscaping), 185,210 (mouldings), and 27,409 (magazines). Adding these four numbers together yields 224,788, the same number found in the "Total" column for Store 1221.

58

"significantly exceed industry standards," it utterly fails to provide any support for that claim.

Moreover, nothing in the slides even hints at processing fraudulent RTVs. Rather, the presentation focuses entirely on legitimate ways to reduce shrink, which undoubtedly is a problem in any retail industry. At most, the presentation merely shows that Home Depot's management was aware of the shrink rates at its stores and worked to reduce it. That is good management; it is not fraud. Because Bucks County's motion for leave presented nothing that would bolster the allegations of scienter in the amended complaint, the district court correctly denied it as futile.

VI.

In sum, the amended complaint fails to surmount the pleading hurdles that Congress has imposed on private securities fraud class actions. Fearing that these types of lawsuits were "injur[ing] the entire U.S. economy" by rewarding "nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests, and manipulation by class action lawyers of the clients whom they purportedly represent," Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S. 71, 81 (2006) (quotation marks omitted), Congress decided to open the courthouse doors only to those plaintiffs whose complaints raised a "strong

59

inference" that the defendants they sought to hold responsible for their losses acted with the required bad intent. And the Supreme Court has unambiguously explained to us that the "strong inference" requirement, though not insurmountable, is difficult to meet -- the inference must be cogent and at least as compelling as any opposing inference. We are constrained to conclude that the allegations in the amended complaint do not pass Congress's stringent test.

    **AFFIRMED.**