[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-11987
Non-Argument Calendar
_____

Docket No. 1:13-cv-02128-WSD

PIEDMONT OFFICE REALTY TRUST, INC.,
f.k.a. Wells Real Estate Investment Trust, Inc.,

Plaintiff-Appellant,

versus

XL SPECIALITY INSURANCE COMPANY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(October 21, 2014)

Before TJOFLAT, JORDAN, and EDMONDSON, Circuit Judges.


PER CURIAM:


CERTIFICATION FROM THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT TO THE SUPREME COURT OF GEORGIA,

PURSUANT TO O.C.G.A. § 15-2-9.  TO THE SUPREME COURT OF

GEORGIA AND ITS HONORABLE JUSTICES:


This case involves the interpretation of an insurance policy under Georgia law.  We must determine (1) whether an insured was "legally obligated" to pay a securities claim, within the meaning of the insurance policy; and (2) whether an insured's failure to obtain its insurer's consent in advance to a settlement agreement barred the insured from seeking payment under the policy even if the insurer withheld unreasonably its consent to the settlement agreement.  Because this appeal seems to present questions of state law that have not yet been decided by the Georgia appellate courts, we seek guidance and certify three questions to the Supreme Court of Georgia.

2

## I.  Background

Piedmont Office Realty Trust, Inc. ("Piedmont") maintained two insurance policies pertinent to this appeal.  First, Piedmont purchased a primary insurance policy ("Primary Policy"), issued by Liberty Surplus Insurance Company, that provided coverage of up to $10 million for claims against Piedmont and Piedmont's officers and directors.  Piedmont also purchased an excess insurance policy ("Excess Policy"), issued by XL Specialty Insurance Company ("XL"), that provided $10 million in coverage in excess of the Primary Policy's coverage limits.

While Piedmont was covered under both insurance policies, Piedmont was named as a defendant in a federal securities class-action suit ("Underlying Suit"), in which plaintiffs claimed over $150 million in damages.  After years of litigation and discovery, the district court granted Piedmont's renewed motion for summary judgment and dismissed the Underlying Suit.  The class-action plaintiffs appealed.

While the appeal was still pending, plaintiffs in the Underlying Suit and Piedmont agreed to mediate the dispute.  In anticipation of mediation, Piedmont sought XL's consent to settle the Underlying Suit for up to the remaining limits of the Excess Policy, which was about $6 million.[1]  But XL agreed to contribute no

---

[1] By the time Piedmont entered into mediation, Piedmont had already exhausted its $10 million coverage limit under the Primary Policy and had used another $4 million of its coverage under XL's Excess Policy defending itself in the Underlying Suit.

more than $1 million towards settlement. Despite XL's position on the settlement amount -- and without further notice to XL and without XL's consent -- Piedmont agreed to settle the Underlying Suit for $4.9 million.

In the Underlying Suit, the district court later entered a Final Judgment and Order, approving the settlement agreement between Piedmont and the class-action plaintiffs. That court "authorize[d] and direct[ed] implementation of all the terms and provisions of the [proposed settlement agreement]."

After executing the settlement agreement, Piedmont sent two demand letters to XL, requesting coverage for the full $4.9 million settlement amount. XL refused coverage beyond the $1 million it had already consented to pay.

Piedmont filed this civil action against XL for breach of contract and for bad-faith failure to settle, pursuant to O.C.G.A. § 33-4-6. XL filed a motion to dismiss Piedmont's complaint, arguing that Piedmont was barred from filing suit by the plain terms of the Excess Policy and by the Georgia Supreme Court's decision in Trinity Outdoor, LLC v. Cent. Mut. Ins. Co., 679 S.E.2d 10 (Ga. 2009). The district court granted XL's motion and dismissed Piedmont's complaint. This appeal followed.

4

## II.  Discussion

We review <u>de novo</u> the district court's dismissal of a case under Fed.R.Civ.P. 12(b)(6), "accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff."  <u>Hill v. White</u>, 321 F.3d 1334, 1335 (11th Cir. 2003).

We begin our analysis by looking at the language of the Excess Policy.  <u>See</u> <u>Erturk v. GEICO Gen. Ins. Co.</u>, 726 S.E.2d 757, 759 (Ga. Ct. App. 2012) ("The starting point for interpretation of contracts for insurance is the contract itself . . . .").  Three provisions of the Excess Policy are at issue in this appeal.[2]  First, the Excess Policy provides that XL will pay only for "Loss . . . which [Piedmont] shall become legally obligated to pay as a result of a Securities Claim . . . ."

Second, the Excess Policy contains a "Consent-to-Settle" provision, which presents these words:

> No Claims Expenses shall be incurred or settlements made, contractual obligations assumed or liability admitted with respect to any Claim without the Insurer's written consent, which shall not be unreasonably withheld.  The Insurer shall not be liable for any Claims Expenses, settlement, assumed obligation or admission to which it has not consented.

---

[2] The Excess Policy is governed by the terms and conditions of the Primary Policy, unless the policies contradict each other.  The parties agree that the terms and conditions of the Primary Policy govern this appeal.

5

Also pertinent to this appeal is the Excess Policy's "No Action Clause," which provides the following: [3]

> No action shall be taken against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this Policy, and the amount of the Insureds' obligation to pay shall have been finally determined either by judgment against the Insureds after actual trial, or by written agreement of the Insureds, the claimant and the Insurer.

The district court was guided by the Georgia Supreme Court's decision in Trinity Outdoor. In Trinity Outdoor, the Georgia Supreme Court ruled -- based on the plain language of the insurance policy's "consent-to-settle" and "no action" provisions -- that a settling insured who failed to obtain its insurer's advance consent to settle was barred from suing the insurer for breach of contract and for bad faith failure to settle. After concluding that the language of XL's Excess Policy was "indistinguishable" from the language of the insurance policy at issue in Trinity Outdoor, the district court dismissed Piedmont's complaint.

The district court first determined that, because Piedmont had entered voluntarily into the settlement agreement, Piedmont was not "legally obligated to

---

[3] We reject Piedmont's argument that XL waived its right to assert the "No Action Clause." The case relied upon by Piedmont, Hoover v. Maxum Indem. Co., 730 S.E.2d 413 (Ga. 2012), is distinguishable from this case. Unlike the defendant insurance company in Hoover, which disclaimed coverage entirely and refused to defend its insured, XL provided Piedmont with a defense to the Underlying Suit, paid over $4 million in coverage for Piedmont's defense costs, planned to continue funding Piedmont's defense, and paid $1 million in settlement costs. In its responses to Piedmont's demand letters, XL also reserved expressly "all of [its] rights under the Policy, at law and in equity." For background, see State Farm Fire & Cas. Co. v. Walnut Ave. Partners, LLC, 675 S.E.2d 534 (Ga. Ct. App. 2009) and State Farm Mut. Auto. Ins. Co. v. Anderson, 123 S.E.2d 191 (Ga. Ct. App. 1961).

6

pay" the securities claim within the meaning of the Excess Policy. The district court explained that, even though the district court in the Underlying Suit issued a final order approving the settlement agreement, that order did not convert an otherwise voluntary agreement into a "legal obligation."

The district court also rejected Piedmont's attempts to distinguish Trinity Outdoor based on the expressed language in the Excess Policy providing that XL's consent to a settlement "shall not be unreasonably withheld." Relying on Trinity Outdoor, the district court concluded that the Excess Policy's "Consent-to-Settle" clause forbid unconditionally Piedmont from settling a claim without XL's consent. To the extent that Piedmont believed that XL breached the contract by withholding unreasonably its consent, the district court determined that Piedmont's only remedy would have been (1) not to have settled as Piedmont did and (2) then to sue XL for damages after a judgment had been obtained against Piedmont following an actual trial or after XL consented -- if it ever consented -- to a settlement amount.

Having reviewed the facts of this case and Georgia case law, including the decision in Trinity Outdoor, we are uncertain how to proceed. On the one hand, the Georgia Supreme Court determined in Trinity Outdoor -- under somewhat similar facts to those presented in this appeal -- that the insured's unconsented-to settlement agreement was not a "legal obligation" within the meaning of the

7

insurance policy.  But here, unlike in Trinity Outdoor, a final court order exists approving of and authorizing and directing the implementation of the terms of the settlement agreement between Piedmont and the class-action plaintiffs in the Underlying Suit.  Although we have found no Georgia appellate decisions addressing the impact of such an order, we think this fact might be material to the analysis in this case.

Another fact we think might be determinative, and that distinguishes this case from Trinity Outdoor, is that the Excess Policy provides expressly that XL's consent to settlement is not to be "unreasonably withheld."  We have found no Georgia case addressing the effect of such a phrase in a consent-to-settle contract provision, but it appears that at least some courts across the nation have approached the issue differently than the district court did here.

For example, at least some courts have addressed the factual issue of whether the insurer acted unreasonably in withholding its consent before the court undertook to determine whether an insured breached the consent-to-settle provision.  See, e.g., Alexander Mfg. v. Ill. Union Ins. Co., 666 F. Supp. 2d 1185 (Dist. Ct. Or. 2009) (in ruling on a motion for summary judgment based on the insured's alleged breach of a consent-to-settle provision, the court must address the reasonableness of the insured's decision to settle; "[a]n insured may act reasonably in breaching a consent-to-settle provision if the insurer unreasonably . . . withholds

8

consent."); Pueblo Country Club v. AXA Corp. Solutions Ins. Co., 2007 U.S. Dist. LEXIS 22647 (Dist. Ct. Colo. 2007) (denying summary judgment when a genuine dispute of material fact existed about whether the insurance company acted reasonably in withholding its consent to a settlement); Fed. Ins. Co. v. Hilco Capital, LP, 2008 Del. Super. LEXIS 259 (Del. Super. Ct. 2008) (denying summary judgment on breach of contract claim, concluding that it was a jury question to determine whether insurance company unreasonably withheld its consent to a settlement agreement).

We accept that "[s]ubstantial doubt about a question of state law upon which a particular case turns should be resolved by certifying the question to the state supreme court." Jones v. Dillard's, Inc., 31 F.3d 1259, 1268 (11th Cir. 2003). Pursuant to O.C.G.A. § 15-2-9, we may certify an unresolved question of state law to the Supreme Court of Georgia if the question is determinative of the case and no clear controlling precedent from the Supreme Court of Georgia exists. Because we are now faced with such a situation, we ask for guidance about Georgia law and certify the following questions to the Supreme Court of Georgia:

(1)  Under the facts of this case, and in the light of the Final Judgment and Order -- in the Underlying Suit -- approving of and authorizing and directing the implementation of the terms of the settlement agreement, is Piedmont "legally

9

obligated to pay" the $4.9 million settlement amount, for purposes of qualifying for insurance coverage under the Excess Policy?

(2)  In a case like this one, when an insurance contract contains a "consent-to-settle" clause that provides expressly that the insurer's consent "shall not be unreasonably withheld," can a court determine, as a matter of law, that an insured who seeks (but fails) to obtain the insurer's consent before settling is flatly barred -- whether consent was withheld reasonably or not -- from bringing suit for breach of contract or for bad-faith failure to settle? Or must the issue of whether the insurer withheld unreasonably its consent be resolved first?

(3)  In this case, under Georgia law, was Piedmont's complaint dismissed properly?

These questions present issues of Georgia state law that can only be resolved finally by the Supreme Court of Georgia.  We are asking for assistance.  In certifying these questions, we do not intend to restrict the issues considered by the state court or to limit the state court's discretion in choosing how to frame or to answer these issues in the light of the facts of this case.  See Miller v. Scottsdale Ins. Co., 410 F.3d 678, 682 (11th Cir. 2005).  To aid the state court's consideration

10

of these questions, the entire record in this case and the briefs of the parties are

transmitted along with this certification.


QUESTIONS CERTIFIED.