[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-10213
_____

D.C. Docket No. 1:11-cv-22556-MGC


CHRISTOPHER BROPHY,
TARA LEWIS,

                                                    Plaintiffs - Appellants,

versus

JIANGBO PHARMACEUTICALS, INC.,
JIN LINXIAN,
ELSA SUNG,
ZILING SUN,
CAO WUBO, et al.,

                                                    Defendants - Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(March 25, 2015)

Before TJOFLAT, JILL PRYOR and FAY, Circuit Judges.

JILL PRYOR, Circuit Judge:

This is an interlocutory appeal from an order granting motions to dismiss by two defendants in a securities class action against Jiangbo Pharmaceuticals, Inc. ("Jiangbo"), its principal officers, and its audit firm. The district court found that plaintiffs Christopher Brophy and Tara Lewis (collectively, the "investors") failed to plead sufficiently their allegations of fraud against defendants Elsa Sung, Jiangbo's former Chief Financial Officer ("CFO"), and Frazer LLP ("Frazer"), Jiangbo's external auditor. Applying the heightened pleading standard imposed by the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4, we affirm.

## I.    BACKGROUND

### A. Jiangbo's troubled tenure on NASDAQ[1]

Jiangbo came into existence as a U.S. corporation in 2007 when its Chinese operational arm, Laiyang Jiangbo, executed a reverse merger with a Florida shell company.[2] The day-to-day operations of Jiangbo's pharmaceutical business remained in China. Jiangbo hired Elsa Sung, a Florida resident, to be its CFO in October of 2007. She remained in her position for several years, throughout most

---

[1] We draw the facts below from the complaint and construe them in the light most favorable to the plaintiffs, as we must on review of a motion pursuant to Federal Rule of Civil Procedure 12(b)(6). *See infra* Part II.

[2] The name of the shell company was Genesis Technology Group, Inc. Jiangbo acquired its current name in 2009.

of the class period during which the investors allege that Jiangbo engaged in fraud, until she resigned on March 31, 2011.  On February 25, 2008, Jiangbo first retained one of Frazer's predecessor entities, Moore Stephens, as its principal accountant.  The investors claim that a number of other Chinese corporations created through reverse mergers eventually also retained Moore Stephens's successor entity, Frazer Frost LLP, as their external auditor.  Frazer Frost LLP remained Jiangbo's auditor during most of the class period, until approximately the end of March 2011, when Jiangbo replaced it with another firm.  Frazer came into being as one of two successor entities when Frazer Frost LLP split on May 1, 2011.[3]

Jiangbo's tenure as a public company was short and fraught with suspicion of misconduct.  Shares began trading on NASDAQ on June 8, 2010 and traded on that exchange for just under a year.[4]  Only six months after trading began, in December 2010, the Securities and Exchange Commission ("SEC") initiated an informal, non-public investigation and requested certain documents from Jiangbo. By February 2011, Jiangbo's internal Audit Committee had launched its own non-public investigation into the SEC's areas of concern and retained Cadwalader, Wickersham & Taft LLP ("Cadwalader") and Ernst & Young ("E&Y") to assist in

---

[3] The other entity produced by the split was Frost PLLC.  The investors allege that both are liable for fraud, but they disclaim any appeal as to Frost PLLC.

[4] The class period is the period during which Jiangbo shares traded on NASDAQ.

that investigation.  The company's fortunes unraveled quickly soon thereafter.  In or around March 2011, Ms. Sung and Frazer withdrew from their respective roles, and the SEC formalized its investigation, which remained non-public.

Jiangbo made two significant disclosures in late May 2011 that marked the culmination of its decline:  it publicly acknowledged the formal SEC investigation for the first time and reported that the company had defaulted on a relatively small principal payment toward debt from its initial financing.  Trading ended days later on May 31, 2011, by which time the share price had fallen from a class-period high of $10.49 per share to $3.08.  By November 2011, after Jiangbo had moved to another exchange, its shares were trading for just $0.14.

## B. The nature of the alleged fraud

As required by securities law governing publicly traded companies, Jiangbo submitted filings to the SEC that disclosed the company's finances and other material information.[5]  The investors' consolidated amended complaint (the "complaint") alleges, *inter alia*, that Ms. Sung and Frazer misrepresented the company's cash balances and failed to disclose a material related-party transaction in statements within or appurtenant to those filings, in violation of Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b–5, 17 C.F.R.

---

[5] These filings included Form 10-Ks, Form 10-Qs, and Form 8-Ks.

§ 240.10b–5.[6]  The alleged related-party transaction involved a $31 million

transfer to Shandong Hilead Biotechnology Co., Ltd. ("Hilead"), a company

controlled by Jiangbo chairman Cao Wubo, who is a defendant in the underlying

action.

### 1. Cash balances

During the class period, Jiangbo consistently reported in its filings with the

SEC that its cash balances were near or above $100 million.  As CFO, Ms. Sung

certified to the SEC that Jiangbo had sufficient internal controls and procedures to

ensure that the filings were accurate and that no material information was missing.[7]

In addition to signing these certifications within Jiangbo's filings, Ms. Sung

participated in multiple conference calls with shareholders in which she reiterated

cash balances from the filings.  During these calls, Ms. Sung emphasized to

shareholders that the company's growth and cash position were "strong."  Doc. 43

at ¶¶ 150, 158, 170.

The investors allege that Jiangbo's cash balances were overstated in the

SEC filings and, consequently, that Ms. Sung's formal certifications and verbal

confirmations of the figures were material misrepresentations.  The complaint lists

---

[6] The complaint also alleges that Jiangbo overstated its accounts receivable and failed to disclose the SEC investigation in filings that followed, but the investors do not assert these claims on appeal.

[7] After Ms. Sung stepped down, she ceased to certify filings or make public statements about Jiangbo's financial position on behalf of the company.  Accordingly, the investors assert no claims against Ms. Sung based on misrepresentations or omissions occurring after her resignation became effective on March 31, 2011.

irregularities in Jiangbo's management of its finances that support an inference that its cash balances were actually much lower.  First, Jiangbo defaulted in early 2011 on a relatively small principal payment—$3.5 million—that it owed on debt from its initial financing years earlier.  Second, Jiangbo failed to make timely payments to Cadwalader and E&Y for their assistance in the internal investigation, and when the company ultimately made a partial payment of only RMB 2.2 million,[8] the funds appeared to have come from the personal account of a Jiangbo employee.  The investors reason that if Jiangbo's cash balances really had been in excess of $100 million for most of the class period, Jiangbo would not have had trouble meeting such minimal obligations.

## 2. Hilead transaction

The investors additionally allege that Jiangbo was involved in a material related-party transaction with Hilead that none of Jiangbo's principal officers, including Ms. Sung, properly disclosed in filings or public statements.  The investors first learned that this transaction might have occurred from the resignation letter, dated June 6, 2011, of two of Jiangbo's independent board members who sat on the Audit Committee (the "resignation letter").  The resignation letter noted that the Audit Committee had issued unsatisfied requests for bank slips showing receipt of the same amount—RMB 200 million, or roughly

---

[8] Using the conversion rate contained in the complaint, the dollar equivalent would have been approximately $341,000.

6

$31 million—from both Jiangbo and Hilead.  The letter further stated that the Audit Committee was awaiting an "Auditor's Verification Report on the capital injection in relation to the RMB 200 million capital of Hilead . . . ."  Doc. 43-1 at 20-21.  Given Mr. Cao's control of Hilead and the size of the transaction relative to Jiangbo's stated cash balances, the investors allege that any such transaction was necessarily "material" and should have been disclosed.  Thus, the investors claim that Ms. Sung's certification of filings and statements to shareholders made material omissions under the meaning of 17 C.F.R. § 240.10b-5 insofar as they did not reference the Hilead transaction.

### 3. Frazer's alleged role in the fraud

The investors allege that Frazer is liable for the same two material misrepresentations or omissions as Ms. Sung, citing a single unqualified audit report that Frazer issued regarding the fiscal year ending in June 2010, which Jiangbo included in its September 2010 filings with the SEC.  The investors argue that Frazer's confirmation of the integrity of Jiangbo's reporting amounts to the same material misrepresentations and omissions within Jiangbo's filings themselves.

### C. Proceedings below

The underlying action is a consolidation of two actions that were filed against Jiangbo in the months after its collapse.  The investors were appointed lead

7

plaintiffs of this new action on November 1, 2011 and filed the consolidated amended complaint on November 16, 2011. The complaint laid out two types of claims: violations of Section 10(b), the principal fraud provision of the Securities Exchange Act, and corollary claims under Section 20(a), which attaches liability to individual persons who control corporations responsible for predicate violations of the Act. *See* 15 U.S.C. §§ 78j, 78t. The investors sought to recover the losses in the value of their holdings that they allege resulted from earlier, fraudulently inflated stock prices and the market's subsequent recognition of that fraud.

Ms. Sung and Frazer moved to dismiss, asserting that the complaint does not sufficiently plead either scienter or the existence of material misrepresentations or omissions, both of which are required to establish a violation of Section 10(b). The district court granted the motions and dismissed the complaint as to Ms. Sung and Frazer, concluding that the complaint fails to state with particularity facts giving rise to a strong inference that Ms. Sung or Frazer acted with scienter, even though the complaint properly pleads allegations that Jiangbo overstated cash balances. This appeal followed.

## II.    ANALYSIS

"We review *de novo* the district court's dismissal of a case under [Federal Rule of Civil Procedure] 12(b)(6), 'accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff.'" *Piedmont*

*Office Realty Trust, Inc. v. XL Speciality Ins. Co.*, 769 F.3d 1291, 1293 (11th Cir. 2014) (quoting *Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003)).  To plead securities fraud in violation of Section 10(b), the investors must sufficiently allege the following elements:  "(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the material misrepresentation or omission and the loss . . . ."  *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1236-37 (11th Cir. 2008).  Our task is to evaluate the district court's conclusions with respect to the first two elements.  Even assuming *arguendo* that the investors have sufficiently pled their allegations of misrepresentations and omissions, we find that significant ambiguities in those allegations make an inference of scienter more difficult to draw.  For that reason, we agree with the district court that the complaint fails to plead that either Ms. Sung or Frazer acted with scienter.

Under the PSLRA, a plaintiff cannot "plead the requisite scienter element generally . . . ."  *Id.* at 1238.  "In this Circuit, § 10(b) and Rule 10b–5 require a showing of either an 'intent to deceive, manipulate, or defraud,' or 'severe recklessness.'"  *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 634 (11th Cir. 2010) (quoting *Mizzaro*, 544 F.3d at 1238).  "[T]he complaint shall, with respect to each act or omission alleged to violate [the Securities Exchange Act],

9

state with particularity facts giving rise to a strong inference that the defendant

acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).  Accordingly,

"[a] complaint will survive [a motion to dismiss] only if a reasonable person would

deem the inference of scienter cogent and at least as compelling as any opposing

inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues &*

*Rights, Ltd.*, 551 U.S. 308, 324 (2007).  Although we draw any reasonable

inferences available on the face of the complaint in the investors' favor, we also

must look to "plausible, nonculpable explanations for the defendant's conduct" in

evaluating an inference of scienter.  *Id.*  In determining the relative merit of

opposing inferences, we "must consider the complaint in its entirety . . . ."  *Id.* at

322.

## A. Ms. Sung

We turn first to the investors' allegation that Ms. Sung confirmed false

reports of Jiangbo's cash balances in SEC filings and shareholder conference

calls.[9]  On appeal, the investors assert the following bases for an inference that Ms.

Sung acted with scienter with respect to overstated cash balances:  the magnitude

of the overstatements; the internal control problems at Jiangbo that were revealed

in the resignation letter; the existence of an SEC investigation; Ms. Sung's position

---

[9] We need only discuss whether there is a strong inference that Ms. Sung acted with scienter when she overstated Jiangbo's cash balances.  In Part II.A.3, *infra*, we show that the investors' failure to plead the timing of the Hilead transaction precludes any inference of scienter that might have arisen from the transaction.

10

as CFO; Ms. Sung's alleged involvement in obstructing the Audit Committee's internal investigation; and Ms. Sung's resignation effective March 31, 2011.[10]

Ms. Sung argues that the opposing inference, that she acted without scienter, is more compelling in the light of several factors:  the absence of particularized allegations that Ms. Sung actually knew about or was on notice of any alleged deficiencies in Jiangbo's reporting; ambiguities and other weaknesses in the investors' allegations of incorrect cash balances; Ms. Sung's residency in Florida, on a different continent from Jiangbo's day-to-day operations; Ms. Sung's assertion that she resigned for family reasons and her decision to continue working with Jiangbo as a part-time consultant after her resignation; and the complaint's failure to allege that Ms. Sung sold any shares during the class period or otherwise profited from the alleged fraud.

From the outset, we note that the investors allege no particularized facts that directly show Ms. Sung intended to deceive shareholders or knew about or was severely reckless with respect to deficiencies in reporting.  *See Thompson*, 610 F.3d at 634.  The investors offer no allegations describing Ms. Sung's day-to-day practices as CFO or identifying any specific misconduct apart from confirming incorrect cash balances within filings and on conference calls.  Instead, the

---

[10] The investors also assert as a basis for an inference of scienter the fact that Ms. Sung misrepresented her status as a Certified Public Accountant ("CPA") in SEC filings.  We agree with the district court that any discrepancy in Ms. Sung's representation that she was a licensed CPA is immaterial.

11

investors' theory is essentially that Ms. Sung must have been aware of the misrepresentations in Jiangbo's filings, given (1) her role as CFO in a company plagued with serious fraud and (2) her suspicious actions during Jiangbo's rapid decline.  We begin our analysis by assessing whether the allegations regarding the scope of the fraud, in the light of Ms. Sung's position as CFO, can support a strong inference of scienter by themselves.  Keeping in mind the relative strength of those allegations, we then turn to whether the allegations that Ms. Sung resigned in the midst of Jiangbo's decline and that she participated in the obstruction of the internal investigation are sufficient to establish a strong inference of scienter.

### 1. Allegations regarding the scope of the fraud

The investors assert that the alleged fraud was so significant and obvious that Ms. Sung must have known about it, or else she was severely reckless in avoiding knowledge of the fraud.  First, the investors claim that the disparity between Jiangbo's actual and reported cash balances must have been extreme—in the tens or hundreds of millions of dollars—so that it would have been difficult or impossible for Ms. Sung not to have known about it in her capacity as CFO.  To support this inference of scienter, the investors continue to rely heavily on their allegations supporting the underlying inference that Jiangbo's accounts were overstated.  Those allegations include:  the company's failure to make payments on debts in amounts that were a small fraction of the stated cash on hand, irregularities

in payments to auditors and lawyers in similarly small amounts, the overt concern of the independent board members that cash balances were stated inaccurately, and the lack of cooperation from Jiangbo's top management during the internal investigation.

Second, the investors allege that a number of red flags should have put Ms. Sung on notice of the fraud. The investors argue that the existence of the SEC investigation supports an inference of scienter in two ways: the investigation should have put Ms. Sung on notice that Jiangbo's financial reporting required more of her own scrutiny, and the fact of the investigation itself suggests that the fraud was significant in its scope. Further, the investors cite the following deficiencies in Jiangbo's management of its financial reporting during the class period that, according to the investors, should have prompted Ms. Sung to look for and discover the fraud: "(1) weaknesses among the accounting and finance personnel, (2) dysfunctional internal controls, and (3) inadequate segregation of duties in the financial reporting function." Doc. 43 at ¶ 196.

The investors rely on the two arguments above to establish successive inferences: that material misrepresentations occurred and that Ms. Sung acted with scienter in making those representations. While the totality of the allegations may well be sufficient to support an inference that Jiangbo materially misrepresented its cash balances, we might still harbor uncertainty about that underlying inference

13

when assessing the strength of an inference of scienter.  Any "omissions and ambiguities count against inferring scienter, . . . [and] the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs*, 551 U.S. at 326.  In a similar vein, this Court has recognized that an inference of scienter is diluted to the extent it is drawn from multiple predicate inferences that are each based on the same allegations.  *See Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1265 (11th Cir. 2006).

Regarding the investors' first argument, we agree with the district court and Ms. Sung that several omissions and ambiguities weaken any inference of scienter to be drawn from the magnitude of alleged overstatements or any red flags.  First, although the investors emphasize the magnitude by which they allege Jiangbo overstated cash balances, they fail to allege any particular amount or even a range; they merely assert in their briefs that the actual balances were "extremely limited[] and nowhere near" the full cash balances reported.  Appellants' Br. at 38.  Without more specifics, the investors cannot persuasively allude to the magnitude of the fraud as a basis for a strong inference that Ms. Sung must have known of the errors as CFO.  *See Mizzaro*, 544 F.3d at 1251 ("[W]e have no reliable way of estimating [the fraud's] total amount, let alone inferring from the dollar amount the knowledge of senior management.").

14

As regards the investors' second argument, we are not persuaded that the red flags the investors identify would have made Jiangbo's fraud obvious to Ms. Sung, even if we also assume that some overstatement of cash balances occurred, because the complaint provides no explanation as to how these red flags should have alerted her to the fraud. Regarding the SEC investigation, the district court correctly noted that "the [complaint] does not contain any allegations about what [Ms.] Sung knew about the scope of the investigation[]." *In re Jiangbo Pharm., Inc., Sec. Litig.*, 884 F. Supp. 2d 1243, 1263 (S.D. Fla. 2012). The "mere existence of an SEC investigation" likewise does not equip a reviewing court to explain which inferences might be available beyond a general suspicion of wrongdoing. *In re Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 952, 962 (8th Cir. 2008). The investors' allegations of internal control problems suffer from the same limitation. With no explanation as to how these vaguely defined problems would have affected financial reporting or how Ms. Sung would have known about them, we cannot rely on them to add much weight to an inference of scienter.

The investors would have us rely solely on Ms. Sung's position as CFO to overlook these omissions and ambiguities in the complaint. They cite cases in which courts recognized a strong inference of scienter based in part on a senior financial executive's oversight of the processes that produce the company's financial statements. However, those cases involve particularized allegations that

15

the executives knew or were severely reckless in disregarding how those processes were distorted by fraud, and so they do not inform our discussion. *See Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 270 (3d Cir. 2009) (finding a strong inference that a CFO was at least reckless in endorsing flawed financial projections because of repeated, focused inquiries from analysts that correctly suggested why the projections were implausible); *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 198-99 (S.D.N.Y. 2010) (finding a strong inference that a CFO acted with scienter on the basis of allegations that he personally reviewed erroneous loan valuations, communicated often with other executives and subordinates, and gave "reassurances" to investors regarding the key issues in the case); *In re Friedman's, Inc. Sec. Litig.*, 385 F. Supp. 2d 1345, 1363 (N.D. Ga. 2005) (finding scienter properly pled where the company's controller was alleged to have reviewed incriminating documents personally and made specific choices in pursuit of an illegal scheme).

Without more particularized allegations, the investors' claim that Jiangbo's fraud was too large for Ms. Sung not to have noticed is unpersuasive. We now consider whether the investors' allegations of Ms. Sung's suspicious behavior can fill the gaps in their allegations regarding the scope of the fraud.

16

**2. Ms. Sung's resignation and alleged obstruction of the Audit Committee**

The investors argue that two actions Ms. Sung took during Jiangbo's decline are persuasive, if circumstantial, proof of her knowledge of the fraud: her resignation as CFO and her alleged obstruction of the Audit Committee's internal investigation.

Various courts have recognized that an executive officer's resignation can strengthen an inference of scienter when it occurs around the same time as an investigation. *See, e.g.*, *Fouad v. Isilon Sys., Inc.*, No. C07–1764, 2008 WL 5412397, at *11 (W.D. Wash. Dec. 29, 2008). The investors do not offer any reason why Ms. Sung's resignation would be incriminating other than for its proximity to internal and external investigations, and so they rely on the general intuition that an officer resigning amid allegations of fraud seeks to disassociate herself from any appearance of wrongdoing. Ms. Sung argued in her motion to dismiss that her "family reasons" for resigning and her continued work for Jiangbo as a consultant after her resignation belie any suggestion that she wanted to disassociate herself from fraud. Doc. 51 at 29. We find this explanation more compelling than the investors' desired inference. Though we do not reflexively credit Ms. Sung's assertion that she had family reasons for resigning, the fact that she continued to work for the company on a part-time basis equally supports a

17

nonculpable explanation.  Her resignation adds weight to an overall inference of scienter, but not a substantial amount of weight.

Regarding the investors' contention that Ms. Sung demonstrated her knowledge of the fraud by assisting Mr. Cao in obstructing the Audit Committee's internal investigation, we note that obstruction of an investigation supports an inference of scienter, particularly where defendants affirmatively make efforts to conceal fraud.  *See, e.g.*, *Katz v. Image Innovations Holdings, Inc.*, 542 F. Supp. 2d 269, 274 (S.D.N.Y. 2008).  The investors claim that Ms. Sung refused to turn over materials requested by the Audit Committee because she was waiting for Mr. Cao's authorization.  While the resignation letter makes clear that she did not grant the Audit Committee the access it requested, the letter also explains that she personally prepared the materials for review and preliminarily agreed to turn them over pending the company's approval.  Doc. 43-1 at 13.  Even if she neglected a prevailing duty to provide her materials to the committee regardless of the chairman's wishes, we do not think these facts add much weight to an inference of scienter, given that she apparently was willing to turn the materials over.  The investors do not allege that she was otherwise unwilling to cooperate or that she took any steps to conceal documents that might reveal fraud.

18

### 3. Timing of the Hilead transaction

We agree with the district court that the lack of information in the complaint concerning the timing of the Hilead transaction is fatal to the allegation that it was a material omission in Jiangbo's SEC filings. "A defendant's omission to state a material fact is proscribed only when the defendant has a duty to disclose." *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1206 (11th Cir. 2001) (alteration and internal quotation marks omitted). The investors contend that Ms. Sung had a general duty "to promptly disseminate accurate and truthful information" that was material to the market price of the stock. Doc. 43 at ¶ 80. Similarly, they contend that Frazer did not exercise "due professional care" in ensuring the accuracy of its report. *Id.* at ¶¶ 195-96. Absent any allegation of when the transaction took place, however, we cannot conclude that Ms. Sung or Frazer violated a duty to disclose the transaction. Furthermore, even if the lack of factual allegations regarding timing did not preclude the investors from identifying a duty to disclose with respect to any given filing, the complaint's barebones information about the alleged transaction would be far from sufficient to tie Ms. Sung to the transaction in any meaningful way. Thus, we do not rely upon the Hilead transaction in conducting our scienter analysis.

**4. Scienter analysis**

To complete our scienter analysis as to Ms. Sung, we must consider her additional arguments that weigh against an inference of scienter. *See Tellabs*, 551 U.S. at 324. First, as a resident of Florida, she was not physically present to observe Jiangbo's day-to-day operations in China. Second, there is no allegation that she sold Jiangbo stock during the class period or otherwise profited from the alleged fraud beyond receiving a salary. In the light of these observations and those articulated above, we conclude that the complaint does not give rise to a sufficiently strong inference of scienter as to Ms. Sung. We acknowledge that Ms. Sung's resignation and her failure to cooperate fully with the Audit Committee are grounds for some suspicion, but the investors are hard pressed to explain how this suspicion is more particularized than the general impression that fraud was taking place at Jiangbo in some unknown fashion. We also acknowledge that if the investors' allegations of overstated cash balances are true, then the investors would have a strong case that Ms. Sung was negligent not to know about these discrepancies. The initiation of two investigations suggests that Ms. Sung may have failed to fulfill basic duties to investors in her capacity as CFO. However, upon drawing all reasonable inferences in the investors' favor, we do not think the complaint establishes that she *must* have known about discrepancies in reporting or that she was severely reckless in not knowing about them. The seriousness of

20

Jiangbo's errors and Ms. Sung's proximity to those errors at most imply negligence, which is not enough to establish scienter. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1281-82 (11th Cir. 1999).

## B. Frazer

The only basis for the investors' claim against Frazer is one unqualified audit opinion dated September 28, 2010 and included in Jiangbo's report on fiscal year 2010, ending June 30, 2010.  That opinion found Jiangbo to be in conformity with proper accounting principles for the years 2008, 2009, and 2010.  The investors argue that Frazer should have disclosed any overstatements of cash balances and material related-party transactions in this report.  The arguments in support of an inference of scienter on Frazer's part are similar to those levied against Ms. Sung:  (1) as auditor, Frazer would have had direct knowledge of cash balances and internal control problems; (2) the SEC launched a formal investigation; and (3) Frazer withdrew from consideration for reappointment around the same time as Ms. Sung resigned and the SEC investigation began.  We note, however, that the timing of Frazer's opinion precludes some of the inferences that the investors seek to draw against Ms. Sung because many of the alleged red flags in this case appeared later in 2010 and then in 2011, after the opinion was issued.

21

The district court employed the following standard for evaluating an inference of scienter as to an external auditor:

"[Plaintiffs] must prove that the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts."

*In re Worlds of Wonder Secs. Litig.*, 35 F.3d 1407, 1426 (9th Cir. 1994) (quoting *SEC v. Price Waterhouse*, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992)).  We think this standard satisfactorily clarifies the plaintiff's obligation in such cases, and so we also employ it.  Of course, the complaint must give rise to a strong inference that the auditor is responsible for such ineptitude or misconduct.

If the inference of scienter against Ms. Sung is tenuous, then the corresponding inference against Frazer is even more attenuated.  As an external auditor, Frazer was a step more removed than Ms. Sung from any alleged indicators of the fraud.  *See Reiger v. PricewaterhouseCoopers LLP*, 117 F. Supp. 2d 1003, 1007-08 (S.D. Cal. 2000) ("[B]ecause an independent accountant often depends on its client to provide the information base for the audit, it is almost always more difficult to establish scienter on the part of the accountant than on the part of its client.").  Moreover, the investors' allegations of Frazer's suspicious behavior are unavailing.  Although the investors assert that Frazer resigned, more accurately, Frazer did not stand for reappointment for the following year.  The

22

separation in time between Frazer's unqualified opinion and its withdrawal from consideration for reappointment further mitigates any inference of scienter that might arise from the firm's withdrawal.

Ultimately, the investors' allegations against Frazer suffer from the same overarching deficiency as those against Ms. Sung:  they fail to articulate a theory of the fraud with any particularity.  The complaint does not set out in what ways Frazer's audit was deficient, there is no allegation that Frazer had extensive involvement with the company beyond what was required to conduct a single audit, and there is no connection between the fact of an SEC investigation and Frazer's state of mind that a reviewing court may reasonably draw on the face of the complaint.  The complaint might make a strong case for negligence—but again, negligence is not enough to establish a strong inference of scienter.  *See Bryant*, 187 F.3d at 1281-82.  The investors fail to satisfy the heightened pleading standard as to Frazer.

### III.    CONCLUSION

The investors fail to allege a theory of fraud that is specific enough in its scope or its connection to Ms. Sung or Frazer to support a strong inference of scienter.  Therefore, we need not address the other elements of a Section 10(b) violation or the corollary Section 20(a) claim applicable only to Ms. Sung.  Although the allegations against Ms. Sung and Frazer might survive motions to

23

dismiss under a less burdensome pleading standard, the PSLRA imposes a high bar.

**AFFIRMED.**