Charles E. McCLAIN, Sr., Robert Rafa, and Conrad Matt, Individually and On Behalf of All Others Similarly Situated, Plaintiffs,

v.

IRADIMED CORPORATION, Roger Susi, and Francis X. Casey, Defendants.

Case No. 14–cv–23337–KMM.

United States District Court, S.D. Florida.

Signed May 26, 2015.

Laurence Matthew Rosen, The Rosen Law Firm, New York, NY, for Plaintiffs.

Christina N. Goodrich, Kevin S. Asfour, Michael J. Quinn, K&L Gates, LLP, Los Angeles, CA, Jonathan Bart Morton, K&L Gates LLP, Miami, FL, for Defendants.

### ORDER ON MOTIONS TO DISMISS

K. MICHAEL MOORE, Chief Judge.

THIS CAUSE came before the Court upon Defendant Iradimed Corporation's

Motion to Dismiss (ECF No. 26) and Defendant Francis X. Casey's and Defendant Roger Susi's Motion to Dismiss (ECF No. 27). Plaintiffs filed a Response (ECF No. 34), and Defendants filed Replies (ECF Nos. 35, 36). The Motions are now ripe for review. UPON CONSIDERATION of the Motions, the Response, the Replies, pertinent portions of the record, and being otherwise fully advised in the premises, the Court now enters the following Order.

## I. BACKGROUND

This is a federal securities class action brought by Lead Plaintiff Charles E. McClain, individually and on behalf of all others similarly situated, alleging violations of federal securities laws and pursuing remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b–5. Am. Compl. at ¶ 1 (ECF No. 15). Plaintiffs allege that Defendants made misleading statements in the time leading up to and following Defendant Iradimed Corporation's ("Iradimed") initial public offering ("IPO"), which resulted in damages to Plaintiffs. Id. Defendant Roger Susi ("Susi") was Iradimed's CEO, President, and Director at all relevant times. Defendant Francis X. Casey ("Casey") was Iradimed's Vice–President of Quality Assurance and Regulatory Affairs at all relevant times. Id. at ¶ 28.

Defendant Iradimed develops, manufactures, markets, and distributes magnetic resonance imaging (MRI)-compatible products in the United States and internationally. Id. at ¶ 2. Plaintiffs allege that in late 2013, Iradimed was presented with a "once-in-a-lifetime opportunity" when its main competitor announced it was completely withdrawing from the MRI-compatible pump business. Id. at ¶ 7. As a result, Iradimed began planning its IPO. Id.

One of Iradimed's main products is its 3860+ infusion pump, which is designed for patients who need to receive necessary intravenous medications while undergoing MRI scans. Id. at ¶ 45. In June 2013, however, Iradimed learned that a part of its 3860+ pump could potentially provide an incorrect recommended value for the flow rate. Id. at ¶ 51. Iradimed determined that the issue could lead to serious adverse health consequences, or even death, and initiated a recall on July 1, 2013. Id. To address the issue, Iradimed made significant changes to the 3860+ pump's software. Id. at ¶ 52. Iradimed did not notify the Federal Drug Administration (the "FDA") of the change and/or obtain premarket clearance at this time.[1] Id.

Between April 7 and 16, 2014, the FDA conducted inspections of Iradimed's offices to follow up on the product recall. Id. at

---

[1]. A Premarket Notification (a "510(k) Application") consists of information that is submitted to the FDA, claiming that a product is substantially equivalent to a device that the FDA has cleared for marketing in the United States. Id. at ¶ 31. The traditional 510(k) Application may be submitted any time a 510(k) Application is required. Id. at ¶ 32. Once a device is on the market, however, if a manufacturer modifies the device, it need not submit a new 510(k) unless the modification "could significantly affect the safety or effectiveness of the device, e.g., a significant change or modification in design, material, chemical composition, energy source, or manufacturing process." 21 C.F.R. § 807.81(a)(3). There are special and abbreviated forms of 501(k) Applications which are specifically designed as streamlined versions to be used by the manufacturer that seeks to make changes to its own product. Id. at ¶ 32. "[T]he burden is on the manufacturer to determine whether a premarket notification should be submitted for a change or modification in a device. The Commissioner believes that the manufacturer is the person best qualified to make this determination." 42 Fed. Reg. 42520, 42522.

¶ 11. Susi personally attended the last two days of the inspection. *Id.* at ¶ 55. At the end of the inspection, the FDA inspector, Richard K. Vogel, issued a Form 483 which noted eight categories of deficiencies.[2] *Id.* at ¶ 58. The eight observations listed in the Form 483 were as follows: (1) procedures for design validation have not been adequately established; (2) procedures for training and identifying training needs have not been adequately established; (3) procedures for corrective and preventive action have not been adequately established; (4) design input requirements were not adequately documented; (5) results of the design risk analysis were not adequately documented; (6) procedures for design review have not been adequately established; (7) procedures for design change have not been adequately established; and (8) records of complaint investigations do not include required information. *Id.* at Ex. 1. Plaintiffs maintain that the deficiencies found in the inspection established that Iradimed's pumps were adulterated.[3] *Id.* at ¶ 59. However, the Form 483 does not explicitly state that Iradimed's 3860+ pumps were adulterated, nor did it instruct Iradimed to stop selling the pumps. *See* Form 483 (ECF No. 15, Ex. 1); Def.'s Mot. to Dismiss at 2.

On June 18, 2014, Iradimed filed a Registration Statement on Form S–1 (the "Registration Statement") with the SEC in connection with its planned IPO. *Id.* at ¶ 63. Iradimed published amended versions of the Registration Statement on July 9 and 11, 2014, all of which were made available to the public.[4] *Id.* The Registration Statement provided:

> We and our suppliers and customers are required to maintain compliance with FDA regulations applicable to medical devices and infusion pumps, and it could be costly to comply with these regulations and to develop compliant products and processes. Failure to comply with these regulations could subject us to sanctions and could adversely affect our business. Even if we are able to obtain approval for introducing new products to the market, we and our suppliers may not be able to remain in compliance with applicable FDA and other material regulatory requirements once clearance or approval has been obtained for a product. These requirements include, among other things, regulations regarding manufacturing practices, product labeling, off-label marketing, advertising and post-marketing reporting, adverse event reports and field alerts. Compliance with these FDA requirements is subject to continual review and is monitored through periodic inspections by the FDA. **For example the FDA conducted routine inspections of our facility in Winter Park, Florida in June 2010 and more recently between April 7 and April 16, 2014. The FDA issued a Form 483 on April 16, 2014 that identified eight observations. The**

---

**2.** "If the FDA's inspector finds any deficiencies, he or she will issue a "Form 483," ... [which] records any observations of non-compliance with [Current Good Manufacturing Practice regulations]. The FDA Form 483 lists the objectionable conditions found during the inspection, thereby notifying the management present at the meeting in writing. At the conclusion of an inspection, the FDA Form 483 is presented and discussed with the company's senior management. Companies are encouraged to respond to the FDA Form 483 in writing with their corrective action plan and then implement that corrective action plan expeditiously." *Id.* at ¶ 57.

**.3.** An "adulterated" or "misbranded" pump cannot lawfully be marketed and sold in the U.S. and may be seized at any time. *Id.* at ¶ 9. The manufacturer is subject to serious civil and criminal penalties. *Id.*

**4.** Each alleged false statement appears in every version of the Registration Statement. *Id.* at ¶ 63.

majority of the observations related to procedural and documentation issues associated with the design, development, validation testing and documentation of software used in certain of our products. Other observations were related to the design validation of pump labeling, design analysis of tube stretching (which was an issue in the August 2012 voluntary recall that has been closed by the FDA), procedures for post-market design review, and control and procedures related to handling certain reported complaints. We submitted a response to the Form 483 in which we described our proposed corrective and preventative actions ("CAPA") to address each of the FDA's observations.

*Id.* at ¶ 64 (emphasis added).

Further, the Underwriting Agreement, which was filed with the SEC and was incorporated by reference into the Registration Statement, provided:

There is not pending or, to the knowledge of [Iradimed], threatened, any action, suit or proceeding to which [Iradimed] or any of its subsidiaries is a party or of which any property or assets of [Iradimed] or its subsidiaries is the subject before or by any court or governmental agency, authority or body, or any arbitrator or mediator, which, if resolved adversely to [Iradimed] is reasonably likely to result in a Material Adverse Effect.

*Id.* at ¶ 68. The SEC declared the Registration Statement filed on July 11, effective on July 15, 2014. Iradimed then sold 2,318,400 shares of its common stock at $6.25 per share, generating net proceeds of about $12.4 million. *Id.* at ¶ 72.

On August 12, 2014, Iradimed announced the results of its second quarter and held a conference call to discuss them. During the conference call, Susi stated that:

We look to continue to generate significant cash in the future quarters increasing our cash position and maintaining the financial strength to facilitate our continued growth. **Further we believe it is important to show ourselves to shareholders and the medical community the market leader that Iradimed has become and we can maintain an operationally consistent and growing business.** With that said we are very pleased with our second quarter performance and operating results. We look forward to the remainder of 2014 as we continue our strong earnings momentum and cash generation combined with consistent growth.

*Id.* at ¶ 73 (emphasis added).

On September 2, 2014, after close of trading, Iradimed announced that it had received an FDA warning letter dated August 18, 2014.[5] *Id.* at ¶ 77. The announcement states in relevant part:

IRADIMED CORPORATION Announces Receipt of FDA Warning Letter

WINTER SPRINGS, Fla., Sept. 2, 2014 (GLOBE NEWSWIRE)—IRADIMED CORPORATION today announced that it received a warning letter from the U.S. Food and Drug Administration ("FDA") relating to an inspection of the Company's facility that took place in April 2014. The Company has provided certain additional information relating to the matters set forth in this press re-

---

5. Defendants state that "[a]s noted in the Form 8–K, Iradimed had recently moved to a new location, and '[a]s a result of the move to this new facility, the Warning Letter was not brought to the attention of management until September 2, 2014.' ... The press release was thus issued on September 2, 2014 and the Form 8–K was filed the very next day, on September 3, 2014." Def.'s Mot. at 4 n. 3. Plaintiffs do not dispute this.

lease, as well as a copy of the warning letter as an exhibit in a Current Report on Form 8–K filed in connection with the issuance of this press release.

The warning letter, among other things, states that a new submission is required under Section 510(k) of the Food, Drug and Cosmetic Act (the "FDCA") for the Company's IV infusion pump systems due to periodic updates of the software on the Company's previously cleared infusion pumps, the mRidium 3860 and mRidium 3850. The warning letter states that such updates are "significant" modifications that could significantly affect the safety or effectiveness of the devices and therefore the products being sold by the Company are "adulterated" and "misbranded" under the FDCA. The warning letter also indicates that the mRidium 3860+ infusion pump requires separate FDA clearance from the mRidium 3860 and mRidium 3850.

The warning letter requests that the Company immediately cease activities that result in the misbranding or adulteration of the mRidium 3860 MRI infusion pump, mRidium 3850 MRI infusion pump, and the mRidium 3860+ MRI infusion pump, such as the commercial distribution of the device. Roger Susi, the Company's President and CEO stated, "We take the matters identified in the warning letter seriously and are in the process of evaluating what corrective actions and associated costs may be required to fully address the matters raised in the warning letter." Sales of the mRidium pumps identified in the warning letter represent a substantial majority of the Company's revenue.

The Company is also in the process of preparing a response to the warning letter and intends to work expeditiously to address the issues raised by the FDA. *See* Request for Judicial Notice at Ex. I (ECF No. 28–9).[6]

On September 2, 2014, Iradimed's stock price closed at $10.40. On September 3, 2014, Iradimed's stock price closed at $7.15, a fall of $3.25, or 31%. *Id.* at ¶ 80.

On September 18, 2014, Iradimed held a conference call during trading hours to discuss the warning letter. *Id.* at ¶ 81. During the conference call, Susi disclosed that Iradimed had, in fact, stopped shipping its pumps domestically. *Id.* at ¶ 82. Iradimed's CFO Chris Scott also disclosed that third quarter revenues were lower than expected. *Id.* Iradimed also disclosed that it would file a 510(k) Application in late October. *Id.* at ¶ 83. Iradimed's stock price closed at $7.32 on September 17. It fell to $7.16 on September 18, and $6.75 on September 19, a fall of $0.57, or 8%. *Id.* at ¶ 84.

Plaintiffs subsequently filed this federal securities class action on behalf of all persons other than Defendants who purchased Iradimed securities between July 15, 2014 and September 2, 2014. In Count One, which is asserted against Iradimed and Susi and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5, Plaintiffs contend that Iradimed and Susi engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the class; omitted to

---

**6.** Federal Rule of Evidence 201 provides that "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it … can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201; *see also Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1278 (11th Cir.1999) (concluding that a court can take judicial notice of documents filed with the SEC).

state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities. Plaintiffs maintain that the scheme was intended to, and, throughout the class period, did: (i) deceive the investing public, including Plaintiffs and other class members; (ii) artificially inflate and maintain the market price of Iradimed securities; and (iii) cause Plaintiffs and other members of the class to purchase Iradimed securities at artificially inflated prices. *Id.* at ¶ 97.

In Count Two, brought pursuant to Section 20(a) of the Exchange Act against the individual Defendants, Plaintiffs assert that because of their senior positions, Susi and Casey knew the adverse nonpublic information about Iradimed's omissions, and had a duty to disseminate accurate and truthful information with respect to Iradimed's business and to promptly correct any public statements issued by Iradimed which had become materially misleading. Plaintiffs state that Susi and Casey each possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

Accordingly, Plaintiffs maintain that the Susi and Casey are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Iradimed.

## II. STANDARD OF REVIEW

■ To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true and construed in the light most favorable to the plaintiff, to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)); *SEC v. ESM Group, Inc.*, 835 F.2d 270, 272 (11th Cir.1988). A complaint must also contain enough facts to indicate the presence of the required elements. *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1302 (11th Cir.2007). However, "[a] pleading that offers 'a formulaic recitation of elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). "[C]onclusory allegations, unwarranted deductions of fact or legal conclusions masquerading as facts will not prevent dismissal." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir.2002).

■ Complaints that charge fraud further require a plaintiff to plead the claim with particularity. Fed.R.Civ.P. 9(b). The elements of a claim for securities fraud under Section 10(b) and Rule 10(b)–5 are "(1) a material misrepresentation or omission; (2) made with scienter; (3) in connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the material misrepresentation or omission and the loss, commonly called 'loss causation.'" *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1236–37 (11th Cir.2008) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005)). Accordingly, in fraud cases, the complaint must state "(1) precisely what statements were made in what documents or oral representations or what omissions were made, (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Id.* at 1237.

The Private Securities Litigation Reform Act (the "PSLRA") imposes two additional requirements in securities fraud cases. First, the PSLRA mandates that a securities fraud class action complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.* at 1238 (quoting 15 U.S.C. § 78u–4(b)(1)(B)). Second, the PSLRA raises the standard for pleading scienter. Specifically, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* (quoting 15 U.S.C. § 78u–4(b)(2)).

■ Plaintiffs also bring a claim under Section 20(a) of the Exchange Act. Section 20(a) "imposes derivative liability on persons that control primary violators of the Act." *Laperriere v. Vesta Ins. Group, Inc.*, 526 F.3d 715, 721 (11th Cir.2008) (per curiam). To state a claim under Section 20(a), Plaintiff must allege: (1) that Defendants committed a primary violation of the securities laws; (2) that the individual Defendants had the power to control the general business affairs of Iradimed; and (3) that the individual Defendants had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in primary liability. *Theoharous v. Fong*, 256 F.3d 1219, 1227 (11th Cir.2001) (quotation marks omitted).

## III. ANALYSIS

### 1. Violations of § 10(b) and Rule 10(b)–5

In their Motions to Dismiss, Defendants dispute the existence of material misrepresentations/omissions, scienter, and loss causation. The Court will address each element in turn.

### (a) Material Misrepresentations/Omissions

1. "[T]he FDA conducted routine inspections of our facility in Winter Park, Florida in June 2010 and more recently between April 7 and April 16, 2014."

■ Plaintiffs contend that Defendants concealed and misrepresented the extent of Iradimed's problems by referring to the April 2014 inspection as "routine" because "the FDA had found that all of Iradimed's products were both misbranded and also adulterated, a finding that is anything but routine and instead can lead to Iradimed's complete inability to sell products in the United States." Am. Compl. at ¶ 65. In other words, Plaintiffs maintain that Defendants misled investors by this statement because the outcome of the FDA inspection was not routine.

However, considering the constant and close supervision of the FDA in Iradimed's industry, the Court cannot conclude that it is misleading to refer to such an inspection as routine. Defendants cite to numerous cases where courts have recognized that FDA "inspections represent a routine aspect of business" for entities subject to its regulations. *Robbins v. Moore Medical Corp.*, 894 F.Supp. 661, 674 (S.D.N.Y. 1995); *see also Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 53 (2d Cir.1995); *In re Open Joint Stock Co. Vimpel–Communications*, No. 04 Civ. 9742(NRB), 2006 WL 647981, at *6 (S.D.N.Y. March 14, 2006). Defendants also cite to cases where courts have recognized that companies do not have an absolute duty to disclose all FDA inspections, Form 483s, or even FDA warning letters. *See, e.g., Anderson v. Abbott Laboratories*, 140 F.Supp.2d 894, 900–901 (N.D.Ill.2001); *see also In re Genzyme Corp.*, No. 09–11267, 2012 WL

1076124, at *3 (D.Mass. Mar. 30, 2012). The Court finds these cases to be persuasive authority for the proposition that FDA inspections are indeed routine aspects of business for entities subject to its regulations.

Further, in multiple sections of its Registration Statements, Iradimed did disclose that "[i]f the FDA does not agree with our proposed CAPA plan, or accepts them but finds that we have not implemented them adequately, or if we otherwise fail to comply with applicable regulatory requirements, the FDA could initiate an enforcement action, including issuing untitled letters, warning letters, fines, injunctions, consent decrees, and/or civil penalties." Accordingly, the Court finds that this statement is not actionable.

> 2. "The FDA issued a Form 483 on April 16, 2014 that identified eight observations."

■ Plaintiffs maintain that this statement is misleading because the FDA actually found seventeen deficiencies in eight categories. However, the Form 483 itself is entitled "Inspectional *Observations.*" *See* Form 483 (emphasis added). The Form 483 separates out each issue identified by the investigation and refers to each as an "observation," labeling them "OBSERVATION 1," "OBSERVATION 2," and so on. *Id.* Its preamble text begins, "This document lists observations made by the FDA representative(s) during the inspection of your facility." *Id.* Accordingly, the Court finds it was not misleading for Defendants to state that the Form 483 identified eight observations. The Court finds that this statement is not actionable.

> 3. The statements did not disclose that all of Iradimed's products were adulterated and misbranded.

■ Plaintiffs contend that Iradimed's Registration Statements were misleading because "[t]he statements omitted to disclose (a) [that] all of Iradimed's products were adulterated and misbranded in light of the August 2013 Modification and (b) Iradimed's failure to follow regulatory requirements and the FDA's own request in filing a new 510(k) Application." Am. Comp. at ¶¶ 65, 70.

However, Plaintiffs present no basis for their claim that the FDA demanded that Iradimed submit a new 510(k) for its infusion pumps following the recall. In their Complaint, Plaintiffs quote from Iradimed's response letter to the FDA's warning letter to show an apparent statement against interest. *See* Warning Letter Response (ECF No. 15, Ex. 3). The full quote is as follows:

> Following the initiation of the MRidium 3860 System's 1145 DERS Recall in July 2013, there were several phone discussions and e-mails between FDA and Iradimed Corporation to determine the possible need for a 510(k) submission related to the recall. From Iradimed's perspective, there was no need for such a submission because we believed that our interactions with FDA, and FDA's acceptance of our recall fix, without further comment indicated that no 510(k) was necessary. Further, we held this belief because FDA accepted our remedial action without seeking an additional submission from the company.

*Id.* This does not support the allegation that the FDA demanded Iradimed submit a new 510(k). If anything, it shows the opposite—that Defendants did not believe they were required to file a new 510(k) Application. *See* also 42 Fed.Reg. 42520, 42522 ("[T]he burden is on the manufacturer to determine whether a premarket notification should be submitted for a change or modification in a device. The Commissioner believes that the manufacturer is the person best qualified to make this determination.").

Further, as of the date of each of the Registration Statements, the FDA had not explicitly stated that Iradimed's products were adulterated or misbranded. Indeed, the record reflects that the FDA did not state that Iradimed's products were adulterated or misbranded until its warning letter, which was sent on August 18, 2014. Thus, Iradimed could not have made any such disclosure prior to that point. Additionally, the Court notes that Defendants did disclose the fact that an inspection had taken place, that a Form 483 had been issued, and that it was a possibility that further action would be taken by the FDA. It would have been premature for Defendants to disclose predictions about the FDA's response to the Form 483 issues. Accordingly, the Court finds that Defendants did not make a material omission by failing to disclose that all of Iradimed's products were adulterated and misbranded.

4. "In general, the observations involved issues related to the 2012 and 2013 product recalls (described in more detail under Product Recalls, below). The majority of the observations related to procedural and documentation issues associated with the design, development, validation testing and documentation of software used in certain of our products."

Plaintiffs contend that two parts of this statement were misleading: (1) "the observations involved issues related to the 2012 and 2013 product recalls;" and (2) "the majority of the observations related to ... certain of our products." Plaintiffs maintain these statements were misleading because, in fact, the observations related specifically to the 3860+ pump, which accounted for a large majority of Iradimed's revenues and profits. Am. Compl. at ¶ 65.

However, the Court finds these statements were accurate and not misleading.

The Form 483 expressly discusses the prior recalls in "OBSERVATION 3." Further, the Form 483 identifies observations regarding some but not all of Iradimed's products. Accordingly, the Court finds this statement is not actionable.

5. "There is not pending or, to the knowledge of [Iradimed], threatened, any action, suit or proceeding to which [Iradimed] or any of its subsidiaries is a party or of which any property or assets of [Iradimed] or its subsidiaries is the subject before or by any court or governmental agency, authority or body, or any arbitrator or mediator, which, if resolved adversely to [Iradimed] is reasonably likely to result in a Material Adverse Effect."

 Plaintiffs contend this statement is misleading because the FDA had informed Iradimed that it was required to file a new 510(k) Application for its 3860+ pump in light of the August 2013 Modifications, had specifically requested that it do so, and Iradimed had ignored the FDA's request. Am. Compl. at ¶¶ 68–69. "Accordingly, Plaintiffs maintain that Iradimed's 3860+ pumps were adulterated, and the FDA would eventually request that Iradimed take them off the market, or seize them itself." *Id.*

As discussed more fully above, at the time the Registration Statements were filed, the FDA had not yet stated its view that the pumps were adulterated and misbranded. *See supra* pp. 1303–04. Additionally, the Court finds that Plaintiffs have presented no basis for their claim that the FDA demanded Iradimed submit a new 510(k) for its infusion pumps following the recall, nor any facts upon which Plaintiffs base their "information and belief" in this regard, as required by the PSLRA. *Id.*

Furthermore, the Form 483 constitutes an inspector's observations during a rou-

tine inspection, and expressly states that it does not represent a final Agency determination regarding compliance.[7] Defendants were not required to prematurely disclose that the FDA might take action against Iradimed. *See Anderson,* 140 F.Supp.2d at 906 (stating that a company's "maintenance of its innocence is not fraud. SEC rules do not create a duty to confess contested charges."); *Chu v. Sabratek Corp.,* 100 F.Supp.2d 827, 835 (N.D.Ill.2000) (finding that a company's "belief that [it] had adequately addressed the FDA's concerns, although obviously mistaken, was not obviously false"). Accordingly, the Court finds this statement is not actionable.

6. "Further we believe it is important to show ourselves to shareholders and the medical community the market leader that Iradimed has become and we can maintain an operationally consistent and growing business."

▮▮▮ Plaintiffs contend that the statement by Susi during the August 12, 2014 conference call "was misleading because Susi omitted to disclose that he had information showing Iradimed's performance was not operationally consistent, in that its manufacturing did not comply with [Current Good Manufacturing Practice regulations], and that in any case Iradimed would not be able to maintain its operations because it was selling adulterated and misbranded 3860+ pumps." Am. Compl. at ¶ 74. Again, the Court finds that at the time this statement was made the FDA had not told Iradimed that it believed its pumps were adulterated and misbranded. Further, the above statement is precisely the sort of "generalized, non-verifiable, vaguely optimistic statements" that courts have deemed not actionable. *Mogensen v. Body Cent. Corp.,* 15 F.Supp.3d 1191, 1211 (M.D.Fla.2014). The Court finds that this forward-looking statement, which was accompanied by cautionary statements about factors that could adversely affect performance, is not actionable. *See* 15 U.S.C. § 78u–5(c)(1)(A)(i).

### (b) Scienter

▮▮▮ In the Eleventh Circuit, " § 10(b) and Rule 10b–5 require a showing of either an 'intent to deceive, manipulate, or defraud,' or 'severe recklessness.' " *Mizzaro,* 544 F.3d at 1238 (quoting *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1284 (11th Cir.1999)). "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from

---

7. In *In re Genzyme Corp.,* No. 09–11267, 2012 WL 1076124, at *3 (D.Mass. Mar. 30, 2012), the court deftly explained why the Form 483 cannot be considered determinative:

> The very Form 483 itself includes statements that tend against a conclusion of materiality. The October 2008 Form 483 stated in bold, capitalized lettering that it was setting forth merely "INSPECTIONAL OBSERVATIONS" that "DO NOT REPRESENT A FINAL AGENCY DETERMINATION REGARDING ... COMPLIANCE." The language was added to Form 483 by the FDA to minimize any "perceived ambiguity that might result in inaccurate conclusions about the compliance of an inspected firm." Because the Form 483 observations "do not represent a final agency determination," they are necessarily interim statements, subject to revision. They are meant to prod a company into taking corrective steps before any more substantial agency action is necessary. It simply cannot be that every critical comment by a regulatory agency—even about matters as important as good manufacturing practices—has to be seen as material for securities law reporting purposes, especially in an industry like Genzyme's, where there is constant and close supervision by the FDA. Indeed, to think otherwise would be to insist on a flood of data that would overwhelm the market and would ironically be, in the end, actually uninformative.
>
> *Genzyme,* 2012 WL 1076124, at *10 (internal citations omitted).

the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id.*

▇▇▇▇ With respect to the pleading of scienter, the PSLRA dictates that a "complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A). A " 'strong inference' of scienter means an inference that is 'cogent and at least as compelling as any opposing inference one could draw from the facts alleged.' " *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007)). "Moreover, the complaint must allege facts supporting a strong inference of scienter 'for each defendant with respect to each violation.' " *Id.* (quoting *Phillips v. Scientific–Atlanta, Inc.,* 374 F.3d 1015, 1016 (11th Cir.2004)).

▇▇▇▇ Plaintiffs assert that "to avoid jeopardizing its IPO, Iradimed conceal[ed] that its 3860+ pumps are adulterated and misbranded." Am. Compl. at ¶¶ 63–74. However, the Registration Statement expressly disclosed: (1) Iradimed's voluntary recalls in August 2012 and July 2013; (2) the FDA's inspection in April 2014; (3) the subsequent receipt of the FDA's Form 483; (4) that Iradimed had "submitted a response to the Form 483 in which we described our proposed corrective and preventative actions ('CAPA') to address each of the FDA's observations"; and (5) that "[i]f the FDA does not agree with our proposed CAPA plan, or accepts them but finds that we have not implemented them adequately, or if we otherwise fail to comply with applicable regulatory requirements, the FDA could initiate an enforcement action, including issuing untitled letters, warning letters, fines, injunctions,

consent decrees, and/or civil penalties." Am. Compl. at ¶ 64. The FDA had not found that Iradimed's devices were adulterated or misbranded at the time the Registration Statement was filed. The record reflects that the warning letter came after the Registration Statement and IPO, and Iradimed promptly disclosed it. Accordingly, Plaintiffs' characterization of Defendants' conduct as concealment or fraud is not supported by the record.

Further, even if Plaintiffs' allegation that Iradimed concealed that its pumps were adulterated and misbranded to avoid jeopardizing its IPO is true, this statement alone cannot establish scienter. The Eleventh Circuit has expressly "reject[ed] the notion that allegations of motive and opportunity to commit fraud, standing alone, are sufficient to establish scienter." *Bryant,* 187 F.3d at 1285. The Court finds that the Complaint lacks sufficient allegations of a fraudulent mindset required under the PSLRA.

### (c) Loss Causation

▇▇▇▇ "To show loss causation in a § 10(b) claim, a plaintiff must offer 'proof of a causal connection between the misrepresentation and the investment's subsequent decline in value.' " *Meyer v. Greene,* 710 F.3d 1189, 1195 (11th Cir. 2013) (citing *Robbins v. Koger Props., Inc.,* 116 F.3d 1441, 1447 (11th Cir.1997)). "By ensuring that only losses actually attributable to a given misrepresentation are cognizable, the loss causation requirement ensures that the federal securities laws do not become a system of investor insurance that reimburses investors for any decline in the value of their investments." *Id.* at 1196 (internal quotation marks omitted). However, as the Court has concluded here that Plaintiffs have failed to establish a material misrepresentation or omission made with scienter, the Court does not

reach the question of whether there was a causal connection between the material misrepresentation and/or omission and any alleged loss.[8]

### 2. Violations of § 20(a) of the Exchange Act (Count Two)

■ As the Court finds they have failed to state a predicate claim for primary liability under Section 10(b), Plaintiffs cannot, as a matter of law, state a claim under Section 20(a). *In re Smith Gardner Securities Litigation,* 214 F.Supp.2d 1291, 1307 (S.D.Fla.2002).

## IV. CONCLUSION

For the foregoing reasons, it is hereby ORDERED AND ADJUDGED that Defendants' Motions to Dismiss (ECF Nos. 26, 27) are GRANTED. It is further ORDERED AND ADJUDGED that this matter is DISMISSED. The Clerk of Court is instructed to CLOSE this case. All pending motions are DENIED AS MOOT.

---

**8.** The Court notes however, that the class period alleged by Plaintiff spanned from July 15, 2014 to September 2, 2014. On July 15, 2014, the first day of the class period, Iradimed sold 2,318,400 shares of its common stock at $6.25 per share. Am. Compl. at ¶ 72. On September 2, 2014, the last day of the class period, Iradimed's stock price closed at $10.40. *Id.* at ¶ 80. This represents a rate of return of approximately 66.4% over the fifty day class period. *Id.* Even factoring in the fall in stock price on September 3, 2014, when Iradimed's stock price closed at $7.15, Iradimed stock still yielded an approximate 14.4% rate in just fifty days. *Id.*